**No. 12-30883**

# United States Court of Appeals
# for the Fifth Circuit

IN RE DEEPWATER HORIZON

On Appeal from the United States District Court for the
Eastern District of Louisiana
C.A. Nos. 2:10-md-2179-CJB-SS & 2:10-CV-4536-CJB-SS

## BP'S OPENING BRIEF ON APPEAL

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Stephen S. Schwartz
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000

Joel M. Gross
Allison B. Rumsey
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, D.C. 20004-1206
Telephone: (202) 942-5000

Don K. Haycraft
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone: (504) 581-7979

*Counsel for BP Exploration & Production Inc.*

April 26, 2013

# CERTIFICATE OF INTERESTED PERSONS

IN RE DEEPWATER HORIZON, No. 12-30883

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,*
Civil Action Nos. 2:10-md-2179-CJB-SS & 2:10-CV-4536-CJB-SS

The undersigned counsel of record certifies that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**DEFENDANT-APPELLANT:**

BP Exploration & Production Inc.

**ATTORNEYS FOR DEFENDANT-APPELLANT:**

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 862-2000

Robert R. Gasaway
Jeffrey Bossert Clark
Aditya Bamzai
Stephen S. Schwartz
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington,  DC 20005
(202) 879-5000

Don K. Haycraft
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA  70139
(504) 581-7979

Joel M. Gross
Allison B. Rumsey
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5000

Robert C. "Mike" Brock
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
(202) 662-6000

**DEFENDANT-APPELLANT:**

Anadarko Petroleum Corp.

**ATTORNEYS FOR DEFENDANT-APPELLANT:**

David Bruce Salmons
Ky E. Kirby
Michael Butler Wigmore
Bryan Michael Killian
Randall M. Levine
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC  20006-1806
(202) 373-6000

James J. Dragna
Bingham McCutchen LLP
355 South Grand Avenue,
Suite 4400
Los Angeles, CA 90071-3106
(213) 680-6400

Deborah D. Kuchler
Kuchler, Polk, Schell, Weiner &
 Richeson, LLC
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
(504) 592-0691

**PLAINTIFF-APPELLEE:**

United States of America

**ATTORNEYS FOR PLAINTIFF-APPELLEE:**

Steven O'Rourke
U.S. Department of Justice
Env't & Natural Res. Div.
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-2779

Ellen J. Durkee
U.S. Department of Justice
Env't & Natural Res. Div.
P.O. Box 7415
Washington, DC 20044-7415
(202) 514-4426

Judy B. Harvey
U.S. Department of Justice
Env't & Natural Res. Div.
P.O. Box 4390
Washington, DC 20044-4390
(202) 514-3932

David Joseph Pfeffer
U.S. Department of Justice
1425 New York Avenue, NW
Suite 10100
Washington, DC 20005-0000
(202) 616-4105

Michelle Terry Delemarre
U.S. Department of Justice
1425 New York Avenue, NW
Room 8020
Washington, DC 20005
(202) 616-4037

Sharon Denise Smith
U.S. Attorney's Office
Eastern District of
 Louisiana
650 Poydras Street, Suite
1600
New Orleans, LA 70130
(504) 680-3000

R. Michael Underhill
U.S. Attorney's Office
Northern District of
 California
Room 7-5395
450 Golden Gate Avenue,
Box 36055
San Francisco, CA 94102
(415) 436-6648

*AMICUS CURIAE*:

Plaintiffs' Steering Committee

**ATTORNEYS FOR *AMICUS CURIAE*:**

Stephen J. Herman
Herman Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
(504) 581-4892

James P. Roy
Domengeaux,Wright, Roy &
Edwards
556 Jefferson Street
Suite 500
Lafayette, LA
(337) 233-3033

/s/ Richard C. Godfrey
*Attorney of Record for*
*BP Exploration & Production*
*Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

In light of the arguments set forth in this brief, Appellant BP Exploration & Production Inc. respectfully submits oral argument will materially help the Court resolve the issues at stake in this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ............................................i

STATEMENT REGARDING ORAL ARGUMENT ................................. v

TABLE OF CONTENTS ............................................................... vi

TABLE OF AUTHORITIES ...................................................... viii

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION ........................................... 7

STATEMENT OF ISSUES ......................................................... 8

STATEMENT OF THE CASE AND THE FACTS ................................. 8

    A.    The *Deepwater Horizon* Vessel and the Macondo Well. ......... 8

    B.    The *Deepwater Horizon* Oil Spill. ......................................... 13

    C.    Statutory Framework. ......................................................... 16

        1.    The CWA's Liability and Penalty Provisions. ............. 16

        2.    The CWA's Definitions of "Vessel" and "Offshore Facility." ....................................................................... 21

    D.    The United States' Motion for Partial Summary Judgment and the District Court's Order............................ 24

    E.    Proceedings in this Court .................................................... 33

SUMMARY OF ARGUMENT ................................................... 34

SUMMARY JUDGMENT STANDARD ................................... 38

ARGUMENT ............................................................................ 39

I.    The District Court Correctly Held That Under Section 1321(b)(7) the Owner of a Vessel and Owner of an Offshore Well Cannot Both Be Liable for the Same Spilled Oil. ................ 39

A.   The Plain Text of the Clean Water Act Contemplates
     Liability Only for a Single Source "From Which" Oil Is
     Discharged. ............................................................................ 39

B.   Common Usage of "From" Confirms That Only One
     Source Instrumentality Should Bear Section 1321(b)(7)
     Liability. ................................................................................ 46

C.   The United States' Position Conflates the Clean Water
     Act's Definitions of "Vessels" and "Facilities" and Is
     Unworkable in Practice. ....................................................... 49

II.   The District Court Nonetheless Incorrectly Granted
      Summary Judgment Against BP. ................................................... 52

A.   Even Under the District Court's Mistaken Test for
     Determining the Single Discharge Source, Material
     Facts Remain in Dispute. ..................................................... 53

B.   Under a Proper Interpretation of Section 1321(b)(7),
     BP Cannot Be Liable as the Owner of the Macondo
     Well Because the Well Was Not the Source "from
     which" Oil Was Discharged. ................................................. 57

C.   Assigning Per-Barrel Civil Penalty Liability Solely to a
     Vessel Owner Like Transocean Is Consistent with
     Reasonable Congressional Policy and the Equities. ............. 65

CONCLUSION ........................................................................................ 71

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bricklayers & Masons Local Union No. 5*
    *Ohio Pension Fund v. Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012) ............................................. 12, 55

*Buffalo Marine Servs. Inc. v. United States*,
    663 F.3d 750 (5th Cir. 2011) ................................................................. 42

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................... 38

*Cooper Indus., Inc. v. Aviall Services, Inc.*,
    543 U.S. 157 (2004) ............................................................................... 66

*County of Suffolk, N.Y. v. First Am. Real Estate Solutions*,
    261 F.3d 179 (2d Cir. 2001) .................................................................. 43

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
    704 F.3d 413 (5th Cir. 2013) ................................................................. 15

*Diamond Roofing v. Occupational Safety &*
    *Health Review Comm'n*,
    528 F.2d 645 (5th Cir. 1976) ................................................................. 43

*Fabi Constr. Co. v. Secretary of Labor*,
    508 F.3d 1077 (D.C. Cir. 2007) ............................................................. 44

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................................... 49

*First Nat'l Bank of Gordon v. Office of Comptroller of Currency*,
    911 F.2d 57 (8th Cir. 1990) ................................................................... 42

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012) ................................................... 55

*Foremost-McKesson, Inc. v. Provident Secs. Co.*,
  423 U.S. 232 (1976) ................................................................ 42

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) ............................................... 44

*Gollust v. Mendell*,
  501 U.S. 115 (1991) ................................................................ 42

*In re: Oil Spill by the Oil Rig "Deepwater Horizon"*
*in the Gulf of Mexico, on April 20, 2010*,
  No. 2:10-md-2179, 2011 WL 4829905 (E.D. La. Oct. 12, 2011) ........... 55

*Jefferson Block 24 Oil & Gas, L.L.C. v. Aspen Ins. UK Ltd.*,
  652 F.3d 584 (5th Cir. 2011) ........................................... 38, 39

*McCarthy v. Northwest Airlines, Inc.*,
  56 F.3d 313 (1st Cir. 1995) ................................................... 42

*Nat'l Oilwell Varco, LP v. Hydril Co., LP*,
  No. 06-170, 2011 WL 467119 (S.D. Tex. Feb. 5, 2011) .................. 56

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998) .................................................................. 67

*Peconic Baykeeper, Inc. v. Suffolk County*,
  600 F.3d 180 (2d Cir. 2010) .............................. 30, 62, 63, 65

*Quindlen v. Prudential Ins. Co. of Am.*,
  482 F.2d 876 (5th Cir. 1973) ................................................. 40

*S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*,
  547 U.S. 370 (2006) .................................................................. 1

*Shell Oil Co. v. United States*,
  538 F.2d 346, 1976 WL 23839 (Ct. Cl. 1976) ....................... 41

*Tull v. United States*,
  481 U.S. 412 (1987) ................................................................ 41

*United States v. Approximately 64.695 Pounds of Shark Fins*,
  520 F.3d 976 (9th Cir. 2008) ................................................. 43

*United States v. BP Exploration & Production Inc.,*
   No. 12-cr-292, Rec. Doc. 65 (E.D. La. Jan. 30, 2013).......................32, 48

*United States v. Coastal States Crude,*
   643 F.2d 1125 (5th Cir. 1981)....................................................31, 57, 60

*United States v. Hoechst Celanese Corp.,*
   128 F.3d 216 (4th Cir. 1997)................................................................44

*United States v. One 1973 Rolls Royce,*
   43 F.3d 794 (3d Cir. 1994) ..................................................................42

*United States v. Transocean Deepwater, Inc.,*
   No. 13-cr-001, Rec. Doc. 31 (E.D. La. Feb. 14, 2013)............................33

*World Ins. Co. of Omaha, Neb. v. Pipes,*
   255 F.2d 464 (5th Cir. 1958)................................................................41

## Statutes

28 U.S.C. § 1292(a)(3) .................................................................................7

28 U.S.C. § 1331.........................................................................................7

28 U.S.C. § 1333.........................................................................................7

28 U.S.C. § 1345.........................................................................................7

28 U.S.C. § 1355.........................................................................................7

33 U.S.C. § 1311(a) ...................................................................................16

33 U.S.C. § 1319(c) ...................................................................................21

33 U.S.C. § 1319(c)(1) ...............................................................................18

33 U.S.C. § 1319(c)(2) ...............................................................................18

33 U.S.C. § 1319(c)(3) ...............................................................................19

33 U.S.C. § 1319(d) .............................................................................19, 21

33 U.S.C. § 1321(a)(2)...............................................................................17

33 U.S.C. § 1321(a)(3) ....................................................................... 22

33 U.S.C. § 1321(a)(10) ..................................................................... 21

33 U.S.C. § 1321(a)(11) ............................................................... 21, 50

33 U.S.C. § 1321(b)(3) ............................................................... 17, 59

33 U.S.C. § 1321(b)(7) ................................................ 7, 20, 21, 39

33 U.S.C. § 1321(b)(8) ..................................................................... 19

33 U.S.C. § 1321(n) ........................................................................... 7

33 U.S.C. § 1362(12) ......................................................................... 62

33 U.S.C. § 1362(14) ......................................................................... 63

33 U.S.C. § 2701(18) ................................................................... 23, 50

33 U.S.C. § 2701(22) ......................................................................... 23

33 U.S.C. § 2701(32) ........................................................... 24, 25, 51

33 U.S.C. § 2701(37) ......................................................................... 23

33 U.S.C. § 2702(a) ........................................................................... 22

42 U.S.C. § 7412(r) ........................................................................... 61

Oil Pollution Act of 1990,
  Pub. L. No. 101-380, 104 Stat. 484 ............................... 1, 22, 23

## Regulations

33 C.F.R. § 27.3 ................................................................................. 18

40 C.F.R. § 19.4 ................................................................................. 18

40 C.F.R. § 68.3 ................................................................................. 62

40 C.F.R. § 110.3 ......................................................................... 17, 59

**Rules**

Fed. R. App. P. 4(a)(1)(B) ................................................................. 7

Fed. R. App. P. 4(a)(7)(A)(ii) .......................................................... 7

Fed. R. Civ. P. 56 ............................................................................ 38

**Secondary Sources**

Bureau of Ocean Energy Mgmt., Regulation & Enforcement,
  *Report Regarding the Causes of the April 20, 2010
  Macondo Well Blowout* (2011) ............................................... 56

Nat'l Comm'n on the BP Deepwater Horizon Oil Spill &
  Offshore Drilling, *Deep Water: The Gulf Oil Disaster
  and the Future of Offshore Drilling
  (Final Report)* (2011) ............................................................. 56

Nat'l Comm'n on the BP Deepwater Horizon Oil Spill &
  Offshore Drilling, *Macondo: The Gulf Oil Disaster
  (Chief Counsel's Report)* (2011) ............................................ 56

Nat'l Comm'n on the BP Deepwater Horizon
  Oil Spill & Offshore Drilling,
  *Stopping the Spill: The Five-Month Effort to Kill the
  Macondo Well* (Staff Working Paper No. 6) (2011) .......... 10, 12

OXFORD ENGLISH DICTIONARY (2d ed. 1989) ............................ 58

## INTRODUCTION

The Supreme Court has admonished that the Clean Water Act ("CWA") is a "complicated statute . . . where technical definitions are worked out with great effort." *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 380 (2006). Interpreting the CWA requires careful attention to statutory text and a firm grasp of the overall statutory scheme. When it comes to applying the CWA, there are no interpretive shortcuts — a court cannot lose sight of either what Congress said in a particular provision or what it provided in the statute as a whole.

In particular, the CWA contains multiple penalty provisions. These multiple provisions impose liability in different ways and on different entities. All of the provisions — including Section 1321(b)(7)'s per-barrel-of-spill civil-penalty provision at the center of this case — must be interpreted in light of both each other and the Oil Pollution Act of 1990, which was enacted, together with additional CWA remedies, in the wake of the *Exxon Valdez* oil spill. *See* Oil Pollution Act of 1990 ("OPA"), Pub. L. No. 101-380, 104 Stat. 484.

Section 1321(b)(7) of the CWA is framed with precision:

Any person who is the *owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil*

*or a hazardous substance is discharged* in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged.

33 U.S.C. § 1321(b)(7) (emphasis added).

The decision below, which arose from the 2010 *Deepwater Horizon* oil spill, turns on the interpretation of Section 1321(b)(7). According to Section 1321(b)(7)'s plain terms and the structure of the CWA, the parties liable for Section 1321(b)(7)'s per-barrel-of-spill maximum penalties can only be those parties that "owned," "operated," or were "in charge of" the *Deepwater Horizon* — for the *Deepwater Horizon* is the "vessel" "from which" all of the spilled "oil" was "discharged" to the Gulf of Mexico. Critically, no one disputes as a factual matter that effectively all oil discharged during the spill entered water from the *Deepwater Horizon* and its appurtenances. Hence, the District Court should have imposed Section 1321(b)(7) penalty liability on the *Deepwater Horizon*'s undisputed owner — Transocean Holdings LLC and its subsidiary Triton Asset Leasing GmbH (collectively, "Transocean") — plus the *Deepwater Horizon*'s operator and person in charge, to the extent those entities are different from Transocean.

In fact, the District Court did correctly impose Section 1321(b)(7) penalty liability based on affiliations with a single source instrumentality — that is, one offshore facility, onshore facility, or vessel. Yet, after correctly deciding to impose liability based on affiliations with a single source instrumentality, the District Court erred in identifying that instrumentality. Although no one disputes that effectively all of the spilled oil discharged from the *Deepwater Horizon* and its appurtenances, the District Court allowed Transocean, the undisputed owner of the *Deepwater Horizon*, to escape practically all Section 1321(b)(7) liability as the owner of the source of the spill.

Furthermore, the District Court imposed Section 1321(b)(7) liability on Anadarko Petroleum Corp. ("Anadarko") and BP Exploration & Production Inc. ("BP"), not because it found they were owners of the *Deepwater Horizon*, but because it found (correctly but irrelevantly) they were owners of the Macondo well, an offshore oil well that the *Deepwater Horizon* was drilling at the time of the spill. This fact was dispositive for the District Court because instead of asking the question posed by Section 1321(b)(7) — "from which vessel or facility was oil discharged?" — the court felt compelled as an equitable matter

to ask a novel and quite different question, "where did an 'uncontrolled' movement of oil ultimately originate?"

Even under this erroneous legal standard, the District Court erred by granting summary judgment under Section 1321(b)(7) against BP and Anadarko. The record evidence is clear that the relevant "uncontrolled" oil movements occurred not in the Macondo well, but in the *Deepwater Horizon* and its appurtenances. The District Court reached a contrary result only by inaccurately characterizing the *Deepwater Horizon*'s blowout preventer ("BOP") — an appurtenance of the vessel that is in fact a critical, active piece of well-control equipment designed to act as a barrier to hydrocarbon flow — as a mere "passive conduit" for flowing oil. Accordingly, even on its own terms, the District Court misapplied law to fact, and its decision must be reversed.

More fundamentally, the District Court erred by looking beyond the statute, consulting its perception of the equities, and crafting a novel test for imposing Section 1321(b)(7) liability. Section 1321(b)(7) of the CWA establishes a locational test for determining strict liability, imposing penalties based on affiliations with the source instrumentality "from which" oil was discharged. Here, Transocean undisputedly owned

the *Deepwater Horizon*, and the *Deepwater Horizon* discharged the relevant oil. Accordingly, a matter of law, BP is not subject to liability under Section 1321(b)(7) as an owner of the Macondo well — although the United States may pursue its alternative theory that BP should bear liability as an operator or person in charge of the *Deepwater Horizon* vessel. *See* USCA5 62 (10-4536) (Dec. 15, 2010 USA Compl. [Rec. Doc. 1] ¶ 71) (pleading alternative theory). In any event, quite apart from Section 1321(b)(7) liability, BP remains subject to enormous financial liabilities under OPA, other CWA provisions, and other applicable laws.

In marked contrast to the District Court's analysis and conclusion, the United States contended below (and will likely contend on appeal) that Section 1321(b)(7) casts a wide net that ensnares not only a discharging vessel or facility but other vessels and facilities as well. Under the United States' theory, the fact that a flow of oil originated in the Macondo well before continuing into the *Deepwater Horizon*'s BOP, *Deepwater Horizon*'s riser, and the *Deepwater Horizon*'s main body (from which it was discharged) means not only Transocean but also BP and Anadarko bear Section 1321(b)(7) ownership liability.

But contrary to the United States' contentions, it makes perfect sense to apply the Act as written and impose liability *only* on those responsible by the statute based on particular affiliations with the discharging vessel or facility. Under Section 1321(b)(7), those who take custody of oil are strictly liable for civil penalties if they spill it. By contrast, placing Section 1321(b)(7) liability on instrumentalities earlier in a custodial chain for oil spilled later on in the chain would create confused lines of responsibility and unfairness. Under the United States' reading of Section 1321(b)(7), parties that drill for oil but do not transport it could be liable for severe civil penalties for spills occurring at every link in a distribution chain — even long after oil has left their control.

Finally, it bears emphasis that Section 1321(b)(7) liability is both strict and punitive in character and so must be narrowly applied. In the District Court, the United States cited no case, regulation, or other precedent establishing (or even contending) that multiple vessels or facilities could be held liable under Section 1321(b)(7). The United States should not be allowed to impose heavy penalties under a novel liability theory announced for the first time in this litigation.

## STATEMENT OF JURISDICTION

This is a civil case brought against, among others, BP, Anadarko, and Transocean by the United States under the CWA, *see* 33 U.S.C. § 1321(b)(7). The case arises from activity in and on the Outer Continental Shelf by the *Deepwater Horizon*, an offshore drilling rig that is a vessel under maritime law. The district court had jurisdiction over this matter under 28 U.S.C. §§ 1331 (federal question), 1333 (admiralty), 1345 (United States as plaintiff), 1355 (fine, penalty, or forfeiture), and 33 U.S.C. §§ 1321(b)(7)(E) and 1321(n) (Clean Water Act).

The District Court issued a decision as to CWA liability on February 22, 2012, reserving the question of damages. USCA5 7798 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). The holding was an interlocutory decree in an admiralty case subject to appeal under 28 U.S.C. § 1292(a)(3).

The District Court did not issue a separate judgment. Pursuant to Fed. R. App. P. 4(a)(1)(B) and 4(a)(7)(A)(ii), Anadarko filed a notice of appeal on August 24, 2012, *see* USCA5 7854 (Aug. 24, 2012 Anadarko

Notice of Appeal), and BP filed a notice of appeal on September 18, 2012, *see* USCA5 8422 (Sept. 18, 2012 BP Notice of Appeal).

The Transocean Appellees moved to dismiss this appeal for lack of jurisdiction on October 23, 2012. A motions panel of this court denied that motion on February 5, 2013. The Transocean Appellees subsequently settled with the United States and are no longer parties to this appeal.

## STATEMENT OF ISSUES

1. Whether the District Court correctly determined that civil penalty liability for oil discharges under 33 U.S.C. § 1321(b)(7) of the Clean Water Act may attach either to an owner of a facility or to an owner of a vessel but not to both at the same time.

2. Whether the District Court erred in granting summary judgment on a theory that the *Deepwater Horizon*'s blowout preventer was a "passive conduit" for oil flow rather than an active well-management device.

3. Whether, given that all of the oil spilled during the *Deepwater Horizon* oil spill was discharged "from" the main body and appurtenances of the *Deepwater Horizon* vessel, the owner of the *Deepwater Horizon* bears ownership liability for civil penalties under Section 1321(b)(7).

## STATEMENT OF THE CASE AND THE FACTS

### A.   The *Deepwater Horizon* Vessel and the Macondo Well.

This action concerns oil spilled from the *Deepwater Horizon* into the Gulf of Mexico in 2010. At the time of the spill, Transocean owned

the *Deepwater Horizon* vessel, a self-propelled, dynamically positioned Mobile Offshore Drilling Unit or "MODU." USCA5 7799 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). The *Deepwater Horizon*, like other MODUs of the type, was a vessel, not a fixed platform. It used large pontoons to remain at all times floating on water — both when using its thrusters during transit from place to place and also when dynamically positioned at an offshore location for purposes of drilling a stationary oil well. *See* USCA5 2393 (National Commission Report [Rec. Doc. 2587-25]).

At the time of the oil spill, the *Deepwater Horizon* had been hired by BP America Production Company to drill an exploratory oil well known as the Macondo well. USCA5 7799 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). BP Exploration & Production Inc. was the majority owner of the Macondo well and the offshore lease block on the Outer Continental Shelf where it was located. Two Anadarko entities, together with MOEX, a nonparty to this appeal, were minority owners of the lease block and well. *See* USCA5 7798-99 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]).

The relevant components of the *Deepwater Horizon* and Macondo well, while technologically and terminologically complex, are readily explainable for present purposes.  On April 20, 2010, the *Deepwater Horizon* was connected to the Macondo well through a segmented, mile-long pipe owned by Transocean called a "riser."  *See* USCA5 7799 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]).  Attached to the bottom of the riser and connected to the Macondo well — about 5,000 feet underwater, standing over five stories high, and weighing over 400 tons — was a BOP also owned by Transocean.  *See* USCA5 2394, 2397 (National Commission Report [Rec. Doc. 2587-25]); Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Stopping the Spill: The Five-Month Effort to Kill the Macondo Well* 1-2 (Staff Working Paper No. 6) (2011), *available at* http://www.oilspillcommission.gov/ sites/default/files/documents/Updated%20Containment%20Working%20 Paper.pdf (visited April 24, 2013) (hereafter "*National Commission Working Paper No. 6*").  A simplified diagram showing the relationship between the Macondo well, the BOP, the riser, and the *Deepwater Horizon* appears as Figure 1.



Figure 1

Source:  *National Commission Working Paper No. 6* at 2.

Significantly, as the District Court recognized, the BOP and riser are both maritime law appurtenances of the *Deepwater Horizon* vessel. *See* USCA5 7799 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]); *see also* USCA5 6520 (Dec. 8, 2011 USA Statement of Facts [Rec. Doc. 4836-2] ¶ 6); USCA5 47 (10-4536) (Dec. 15, 2010 USA Compl. [Rec. Doc. 1] ¶ 12).

A BOP is "a stack of enormous valves that rig crews use both as a drilling tool and as an emergency safety device."  USCA5 2393 (National Commission Report [Rec. Doc. 2587-25]).  A BOP thus "operates as a failsafe device designed to stop a blowout from progressing and, in the event of loss of control, seal the well and stop

the flow of oil." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 230-31 (S.D.N.Y. 2012). As such, the BOP was essential to "operation of the Macondo Well, including well control." USCA5 55 (10-4536) (Dec. 15, 2010 USA Compl. [Rec. Doc. 1] ¶ 46); *see also infra* Part II.A (Second). The *Deepwater Horizon* BOP could be manually activated to seal the well, and it also included a "deadman" system that was designed to seal the well automatically in an emergency. USCA5 2394 (National Commission Report [Rec. Doc. 2587-25]).

Beneath the blowout preventer was the "wellhead" and below that several more miles of pipe (called "casing") down to a total depth of more than 18,000 feet below sea level and approximately 13,000 feet below the seafloor. *See National Commission Working Paper No. 6* at 2. Unlike the riser and BOP, the wellhead and casing — which, together with associated parts, made up the Macondo well — were owned or leased by the well owners, BP and Anadarko. *See* USCA5 7799 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). In contrast to Transocean's BOP, the Macondo well did not include moving parts or valves intended to seal the well automatically or to be hydraulically and electronically

controllable by persons on board the *Deepwater Horizon*. *See* USCA5 2392-94 (National Commission Report [Rec. Doc. 2587-25]).

### B.    The *Deepwater Horizon* Oil Spill.

On April 20, 2010, while the *Deepwater Horizon* was engaged in lining the Macondo well with cement so the well could be abandoned temporarily for later production, a blowout occurred. *See* USCA5 7799 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]); USCA5 7549 (Jan. 16, 2012 USA Resp. to Anadarko Statement of Facts [Rec. Doc. 5216] ¶ 6). During this blowout, hydrocarbons escaped from the reservoir miles below the surface of the Gulf, entered the Macondo well, rose up through the well, then past the wellhead, through the BOP, through the riser above the BOP, and finally exited from the riser out to the *Deepwater Horizon* itself. *See* USCA5 7799 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]); USCA5 7553-55 (Jan. 16, 2012 USA Resp. to Anadarko Statement of Facts [Rec. Doc. 5216] ¶¶ 17-22). Once on the rig floor and engine room, some of the oil and gas caught fire in a large explosion, while other oil may have spilled into the Gulf. *See* USCA5 7799 n.4 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]) (describing the factual dispute on this question).

The *Deepwater Horizon* burned continuously from the April 20 explosion until it sank two days later. *See* USCA5 7799 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). As it sank, the *Deepwater Horizon* drifted away from the wellhead where it had been positioned while drilling. In the course of this descent, the mile-long riser pipe that had connected the *Deepwater Horizon* to its BOP on the seafloor "kinked" — that is, bent downward toward the seafloor — several feet above the BOP, which remained fixed atop the wellhead. *See* USCA5 2398 (National Commission Report [Rec. Doc. 2587-25]). Meanwhile, at its other end, the riser broke apart from the main body of the vessel. *Id.*

Because the BOP did not seal the oil flow either before or after the explosions and sinking of the *Deepwater Horizon*, oil continued to flow out of the Macondo reservoir, up through the Macondo wellbore, through the *Deepwater Horizon* BOP, and through the mile-long but now "kinked" riser before discharging from the riser's open end into the Gulf of Mexico. In the first few days after the spill, oil flowed solely around the "kink" or bend above the BOP and out of the end of the riser. After approximately eight days of oil flowing in this fashion, holes eroded in the metal forming the riser at the point of the kink, and oil

14

began flowing through those holes as well.  (Aug. 9, 2012 Source Control Stipulations [MDL 2179 Rec. Doc. 5809] ¶ 40.)  A month later, on June 3, 2010, the riser was cut away and removed just above the BOP at the direction of the Unified Area Command, the governmental entity headed by Admiral Thad Allen that oversaw the massive spill response efforts.  USCA5 2424 (National Commission Report [Rec. Doc. 2587-25]).  This cutting left only a stub of the original mile-long riser connected to the BOP — from which oil continued to flow into the Gulf.

Notwithstanding the United States' and BP's diligent efforts to stanch the flow and collect as much oil as possible, oil continued to flow from the now-severed riser into the Gulf until a capping device was placed on top of the BOP on July 13, 2010 and closed two days later on July 15, 2010.  *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 424 (5th Cir. 2013) (affirming District Court's judicial notice of this date).  By that time, the spill had continued for approximately 86 days.  Throughout this entire period, all of the flow that entered the Gulf reached water only after passing the BOP's valve system designed to control the flow of hydrocarbons leaving the well and entering these *Deepwater Horizon* appurtenances.  USCA5 7554

(Jan. 16, 2012 USA Resp. to Anadarko Statement of Facts [Rec. Doc. 5216] ¶ 18) ("The United States does not dispute that oil flowed through the *Deepwater Horizon*'s BOP and riser before entering the Gulf of Mexico[.]").  Moreover, other than for a two-day period between July 13 and July 15 (when oil flowed through spill-response capping equipment secured on top of the BOP), every last oil drop that entered the Gulf did so after exiting directly either from the *Deepwater Horizon*'s main body or from *Deepwater Horizon* appurtenances used while drilling was underway. *Id.*

## C.    Statutory Framework.

Several related, but distinct, CWA and OPA provisions govern oil spills and establish different types of liability based on different showings of scienter or strict liability for different kinds of entities.

### 1.    *The CWA's Liability and Penalty Provisions.*

The CWA broadly prohibits discharges of pollutants.  Section 1311 of the Act states that, except in compliance with various regulatory and permitting requirements, "the discharge of any pollutant by any person shall be unlawful."  33 U.S.C. § 1311(a).

Section 1321 of the CWA specifically prohibits the "discharge of oil or hazardous substances" in "such quantities as may be harmful as

16

determined by the President." 33 U.S.C. § 1321(b)(3). For purposes of Section 1321, the term "discharge" excludes discharges made in compliance with permits, but includes "any spilling, leaking, pumping, pouring, emitting, emptying, or dumping." *Id.* § 1321(a)(2). As to oil, a "harmful" quantity has been defined as an amount that "[v]iolate[s] applicable water quality standards" and that "[c]ause[s] a film or sheen or discoloration of the surface of the water or adjoining shorelines or cause[s] a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3.

While Section 1311 broadly prohibits the discharge of "any pollutant" and Section 1321(b)(3) more narrowly prohibits discharges of oil and hazardous substances, neither provision spells out the remedies available when it is violated. Instead, the available remedies, including civil and criminal penalties, are set forth by a calibrated CWA remedial regime that takes account of the type of pollutant involved, conduct at issue, entity involved, and whether the entity is a repeat offender.

Section 1319 sets forth a series of penalties, criminal and civil, that apply broadly to "*any person*" who violates, among other provisions, Sections 1311 and 1321(b)(3). Specifically, Section 1319(c)(1)

17

establishes criminal liability for "*[a]ny person*" who negligently violates, among other provisions, Section 1311 and Section 1321(b)(3). Violators are subject to a fine between $2,500 and $25,000 per day of violation and imprisonment for up to one year. 33 U.S.C. § 1319(c)(1)-(1)(A); *see also* 40 C.F.R. § 19.4 (indexing CWA penalties for inflation); 33 C.F.R. § 27.3 (same). Neither of the rules has been updated since 2010. Repeat violators are subject to a fine up to $50,000 per day and imprisonment up to two years. 33 U.S.C. § 1319(c)(1)-(1)(A).

Section 1319(c)(2) provides stiffer criminal liability for "*[a]ny person*" who "*knowingly*" violates, among other provisions, Sections 1311 and 1321(b)(3). Violators of Section 1319(c)(2) are subject to a fine between $5,000 and $50,000 per day of violation and to imprisonment for up to three years. *Id.* § 1319(c)(2)-(2)(A). Repeat violators of Section 1319(c)(2) are subject to a fine of up to $100,000 per day of violation and imprisonment of up to six years. *Id.*

Section 1319(c)(3) provides still more severe criminal liability for "*[a]ny person*" who violates, among other provisions, Sections 1311 and 1321(b)(3) while knowing "at that time that he thereby places another person in imminent danger of death or serious bodily injury." Persons

who violate Section 1319(c)(3) are subject to a fine of up to $250,000 and imprisonment of up to 15 years. *Id.* § 1319(c)(3)(A).

Finally, and also relevant here, Section 1319(d) provides for civil penalty liability for "*[a]ny person*" who violates, among other provisions, Section 1311 or any permit condition or limitation implementing Section 1311, but not Section 1321(b)(3). Violators of Section 1319(d) are subject to civil penalties of up to $25,000 per day for each violation, with the actual penalty determined by a court based on an enumerated list of penalty factors. *Id.* § 1319(d).

Section 1321(b)(7) — the provision directly at issue in this appeal — creates civil penalty liability that parallels Section 1319(d) civil penalty liability but with some important differences. Like Section 1319(d), Section 1321(b)(7) imposes civil penalties on a basis of strict liability and with a maximum fine of up to $25,000 per day. Like Section 1319(d), Section 1321(b)(7) penalties are assessed based on penalty factors that mirror in many respects the Section 1319(b) factors. *Compare* 33 U.S.C. § 1319(d) *with* 33 U.S.C. § 1321(b)(8).

But unlike Section 1319(d), which can be used to penalize violations of multiple CWA provisions, Section 1321(b)(7) is limited to

discharges of oil and hazardous substances in violation of Section 1321(b)(3). And unlike 1319(d), Section 1321(b)(7) establishes a narrow set of liable parties that, while subject to the same penalty as parties liable under 1319(d), are also subject to a potentially much stiffer per-barrel-of-spill maximum penalty. *See* 33 U.S.C. § 1321(b)(7).

Specifically, while both Section 1319(d) and Section 1321(b)(7) provide for fines of up to $25,000 per day, only Section 1321(b)(7) provides for an alternative maximum of "up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged." *Id.* § 1321(b)(7)(A); *see also id.* § 1321(b)(7)(D) (providing for trebling of this maximum penalty in cases of gross negligence or willful misconduct). And while Section 1319(d), like the Section 1319(c) criminal penalty provisions, imposes civil liability on "any person" who plays a sufficiently causal role in a discharge, Section 1321(b)(7) imposes strict civil penalty liability only on three categories of persons who must be proved to have specifically defined relationships to the discharging vessel or facility:

> Any person who is the *owner, operator, or person in charge* of *any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged* in violation of paragraph (3), shall be subject to a civil penalty in an

> amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged.

*Id.* § 1321(b)(7)(A) (emphasis added).

In summary, the CWA's interrelated series of penalties for oil spills includes —

- Some penalties applicable to "any person" and any pollutant but that are triggered only by a showing of scienter (*see* Section 1319(c) (criminal provisions));

- Some penalties applicable to "any person" and any pollutant regardless of scienter (*see* Section 1319(d) (civil penalties)); and

- Some penalties applicable without scienter but only to the "owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged" (*see* Section 1321(b)(7)).

### 2. *The CWA's Definitions of "Vessel" and "Offshore Facility."*

The CWA contains carefully considered and mutually exclusive definitions of "onshore facility," "offshore facility," and "vessel" for purposes of Section 1321(b)(7). The distinction between the mutually exclusive categories of onshore and offshore facilities is obvious and codified by statute. *See* 33 U.S.C. §§ 1321(a)(10), (11).

The CWA also establishes mutually exclusive definitions of "vessels" and "offshore facilities." A "vessel" includes "every description

21

of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel." 33 U.S.C. § 1321(a)(3).  An offshore facility, by contrast, "means any facility of any kind located in, on, or under, any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, *other than a vessel or a public vessel*."  *Id.* § 1321(a)(11) (emphasis added).

The mutually exclusive CWA definitions of "vessel" and "offshore facilities" stand in contrast to the statutory regime established under the Oil Pollution Act.  OPA was enacted in a different part of the same session law that added Section 1321(b)(7) to the CWA, and it broadly provides compensatory liability for oil spills, just as CWA Section 1321(b)(7) provides for civil penalty liability for oil spills.  Under OPA, "each *responsible party* for a vessel or a facility from which oil is discharged . . . is liable for the removal costs and damages" specified in the statute.  33 U.S.C. § 2702(a) (emphasis added); *see* Oil Pollution Act of 1990, Pub. L. No. 101–380, § 1002, 104 Stat. 484, 489 (1990)

(enacting Section 2702); *id.* § 4301(b)(7), 104 Stat. 484, 536 (enacting Section 1321(b)(7)).

In contrast to the CWA, OPA specifically envisions an overlap between the categories of "vessels" and "offshore facilities." As under the CWA, OPA defines a vessel to include "every description of watercraft" other than "a public vessel." *Id.* § 2701(37). As under the CWA, OPA also defines an offshore facility as "any facility of any kind" located offshore, "other than a vessel or a public vessel." *Id.* § 2701(22). But OPA alone and not the CWA defines "mobile offshore drilling unit" as "a vessel (other than a self-elevating lift vessel) *capable of use as an offshore facility*." *Id.* § 2701(18) (emphasis added). Under OPA but not the Clean Water Act, whether a MODU is treated as a vessel alone, or as both a vessel and facility, depends upon the activity in which the MODU is engaged.

In short, the CWA defines "vessels" and "offshore facilities" as mutually exclusive categories. But under OPA, a MODU like the *Deepwater Horizon*, while always remaining a vessel, also becomes an offshore "facility" — for which the lessee of the area in which the MODU is drilling is responsible — during times when the MODU is

exploring for, drilling for, or producing oil "in, on, or under" navigable waters.  33 U.S.C. § 2701(32)(C).

### D.  The United States' Motion for Partial Summary Judgment and the District Court's Order.

Following the *Deepwater Horizon* spill, the United States initiated a civil action against BP, Anadarko, Transocean, and several other parties.  *See* USCA5 43 (10-4536) (Dec. 15, 2010 USA Compl. [Rec. Doc. 1]).  That action, which remains pending in the District Court during this interlocutory appeal, asserts two claims for relief.  **First**, the complaint seeks civil penalties under CWA Section 1321(b)(7).  **Second**, it seeks a declaratory judgment that the Defendants are liable to the United States under OPA for past and future removal costs and damages resulting from the discharge of oil.

On December 8, 2011, the United States filed a motion for summary judgment on these claims.  *See* USCA5 6471 (Dec. 8, 2011 USA Mot. for Summ. J. [Rec. Doc. 4836]).  As relevant to this appeal, the United States contended that Transocean, BP, and Anadarko are all liable for civil penalties under Section 1321(b)(7).

The United States' motion also sought a ruling that Anadarko and Transocean were liable as responsible parties under OPA.  USCA5 6488

(Dec. 8, 2011 USA Mot. for Summ. J. [Rec. Doc. 4836-1]).  But as to OPA liability, the United States did not need to win a contested ruling against BP — for BP had long-since accepted OPA responsible-party status and waived the OPA statutory limitations on the amount of legitimate compensatory claims that BP would pay.  *See, e.g.*, USCA5 7802 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]) ("BP and Anadarko generally do not dispute their liability under OPA."); USCA5 7809 n.17 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]) ("BP has waived its liability cap[.]").  Because the *Deepwater Horizon* was a MODU in use as an offshore facility (as defined by the OPA) at the time of the spill, BP never questioned its liability as a responsible party under OPA.  BP understood that OPA responsible-party status was rightly attributable to BP as a lessee of the area in which the *Deepwater Horizon* was drilling.  *See* 33 U.S.C. § 2701(32)(C) (responsible party for offshore facility includes "the lessee or permittee of the area in which the facility is located"); *see also* USCA5 7806 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]) ("[T]he definitions in Section 1001 [33 U.S.C. § 2701] established a default rule that the responsible party would be the lessee when the MODU is being used as an offshore facility.").

Most relevant here, the United States' summary judgment motion acknowledged the Transocean Defendants "are owners and operators of the mobile offshore drilling unit ('MODU') *Deepwater Horizon* and its appurtenances, including the riser and BOP."   USCA5 6485 (Dec. 8, 2011 USA Mot. for Summ. J. [Rec. Doc. 4836-1]).   The United States further contended that BP "is an owner and operator of the Macondo Well, an offshore facility," *id.*, that the Anadarko Defendants are "operators of the Macondo Well, an offshore facility under the Clean Water Act," and that "[Anadarko] is an owner of the Macondo Well." USCA5 6486 (Dec. 8, 2011 USA Mot. for Summ. J. [Rec. Doc. 4836-1]).

The United States' motion conceded important facts about how the oil spill occurred.   According to the United States, "oil was discharged from the Macondo Well and the *Deepwater Horizon*, including from the blow-out preventer, riser, and other appurtenances, and continued *to flow into the waters of the Gulf of Mexico*."   USCA5 6487 (Dec. 8, 2011 USA Mot. for Summ. J. [Rec. Doc. 4836-1]) (emphasis added).   As the United States put it, "[t]he fact that *oil exited from the appurtenances of the Deepwater Horizon* is a matter of public knowledge."   USCA5 6490 (Dec. 8, 2011 USA Mot. for Summ. J. [Rec. Doc. 4836-1]) (emphasis

added).  And "there is no dispute that the blow-out preventer ('BOP')
and riser are appurtenances of the *Deepwater Horizon*."  USCA5 6491
(Dec. 8, 2011 USA Mot. for Summ. J. [Rec. Doc. 4836-1]).

Notwithstanding the United States' acknowledgement that oil
flowed "into the waters of the Gulf of Mexico" after "exit[ing] from the
appurtenances of the Deepwater Horizon," the United States' motion
contended that "[t]he discharge came from *both* an 'offshore facility' and
from a 'vessel.'"  USCA5 6503 (Dec. 8, 2011 USA Mot. for Summ. J.
[Rec. Doc. 4836-1]) (emphasis added).  According to the United States, it
was sufficient that "[u]nder the common usage of 'from,' there clearly
was a single and continuous discharge 'from' the Macondo Well and the
*Deepwater Horizon*."  USCA5 6505 (Dec. 8, 2011 USA Mot. for Summ. J.
[Rec. Doc. 4836-1]).  The United States concluded that Transocean, BP,
and Anadarko were all liable under Section 1321(b)(7).

Transocean, BP, and Anadarko all opposed the United States'
motion.  Remarkably, Transocean contended that the discharge was not
"from" the *Deepwater Horizon* at all but instead "from" the Macondo
well.  *See* USCA5 6940-46 (Jan. 9, 2012 Transocean Opp. to USA Mot.
for Summ. J. [Rec. Doc. 5103]).  According to Transocean, "from" refers

in Section 1321(b)(7) to the "source or original or moving force of something," but the BOP and riser "were merely conduits through which oil travelled." USCA5 6945 (Jan. 9, 2012 Transocean Opp. to USA Mot. for Summ. J. [Rec. Doc. 5103]) (citation omitted); *see also* USCA5 7663 (Jan. 19, 2012 Transocean Reply in Supp. of Mot. for Summ. J. [Rec. Doc. 5300]) (issue is what provided "the moving force for the pollutant to enter navigable waters").

BP's and Anadarko's oppositions to the United States' motion were straightforward. They contended, *first*, that the *Deepwater Horizon* and its appurtenances were separate and distinct for CWA purposes from the Macondo well, USCA5 7036 (Jan. 9, 2012 Anadarko Opp. to USA Mot. for Summ. J. [Rec. Doc. 5113-2]); and, *second*, that oil indisputably discharged into the Gulf of Mexico only from the *Deepwater Horizon* and its appurtenances, USCA5 7038 (Jan. 9, 2012 Anadarko Opp. to USA Mot. for Summ. J. [Rec. Doc. 5113-2]); *see also* USCA5 7342 (Jan. 9, 2012 BP Opp. to USA Mot. for Summ. J. [Rec. Doc. 5124]) (adopting and incorporating this argument).

On February 22, 2012, the Court issued an Order and Reasons making summary judgment rulings in the United States' favor based on

BP and Anadarko's liability under Section 1321(b)(7) as owners of the Macondo well and a ruling in Transocean's favor holding that Transocean was not liable under Section 1321(b)(7) for subsea discharges as the owner of the *Deepwater Horizon* vessel. *See generally* USCA5 7798 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). The Court declined to grant the United States' motion for summary judgment against Transocean under the United States' alternative theory that Transocean is subject to 1321(b)(7) liability as an operator of the Macondo well. USCA5 7821 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). Likewise, the United States did not seek summary judgment against BP under its alternative theory that BP was an operator "and/or" a person in charge of the *Deepwater Horizon* vessel. USCA5 62 (10-4536) (Dec. 15, 2010 USA Compl. [Rec. Doc. 1] ¶ 71). As to Section 1321(b)(7) penalty liability, therefore, the District Court's rulings resolved only questions of ownership liability, while leaving unresolved the United States' alternative liability theories against BP and others.

Like the United States' motion, the District Court's decision acknowledged that "[t]he BOP and riser are appurtenances of the

DEEPWATER HORIZON." USCA5 7799 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). But then, accepting a version of Transocean's argument, the Court reasoned that the word "from" in Section 1321(b)(7) means "a starting point" or "source or original or moving force of something." The Court asserted that "discharge" does "not necessarily mean the point where oil entered the marine environment." USCA5 7815 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). According to the Court, the important location for fixing CWA liability was the point "*where the uncontrolled movement of oil began*, as contended by Transocean." USCA5 7815 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]) (emphasis added) (citing *Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180 (2d Cir. 2010)).

The Court held that the United States had met its summary judgment burden of showing that the uncontrolled movement of oil began in the Macondo well:

> It is true that, for three months in 2010, images of oil gushing out of Transocean's broken riser saturated news media. Yet, few would conclude from these images that the flow of oil was controlled while in the Macondo Well, and only began its movement seaward in the riser or the BOP. In fact, it is undisputed that oil flowed uncontrollably even while the riser was still connected to the MODU. Pressure within the earth drove hydrocarbons up the Macondo Well,

through the BOP, and finally out the riser. Thus, *the uncontrolled movement of oil began in the well. The riser and BOP, by contrast, were merely passive conduits through which oil flowed. For purposes of Section 311(b)(7), oil discharged from the Macondo Well.*

USCA5 7816 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]) (emphasis added and footnote omitted).

The Court did not cite Clean Water Act cases for the proposition that the important point for fixing CWA liability is where "the uncontrolled movement of oil" began. Nor did it cite record facts for the propositions that "the uncontrolled movement of oil began in the well," or that the riser and BOP "were merely passive conduits through which oil flowed." The Court did assert that imposing liability upon BP and Anadarko was consistent with the CWA's goals because the Act is "designed to 'place[] a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same.'" USCA5 7817 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]) (quoting *United States v. Coastal States Crude*, 643 F.2d 1125, 1128 (5th Cir. 1981)).

The District Court left open a possibility that Transocean might bear 1321(b)(7) penalty liability as the *Deepwater Horizon*'s owner. Specifically while holding Transocean free from liability as the *Deepwater Horizon* owner for all subsea discharges of oil from the *Deepwater Horizon*'s appurtenances, the Court left open a possibility that Transocean might bear owner liability for any oil that may have been spilled from the *Deepwater Horizon*'s main body after the rig exploded on April 20, 2010, but before it sank on April 22. USCA5 7799 n.4, 7816 n.27 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). Moreover, as noted above, the District Court reserved whether Transocean could be held liable as an "operator" or "person in charge" of the Macondo well. USCA5 7721 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]).

After the District Court's ruling, on January 30, 2013, Judge Vance of the Eastern District of Louisiana accepted a criminal guilty plea from BP for, among other counts, a single misdemeanor violation of Section 1319(c)(1)(A) insofar as it violated Section 1321(b)(3). *See United States v. BP Exploration & Production Inc.*, No. 12-cr-292, Rec. Doc. 65 (E.D. La. Jan. 30, 2013) (Vance, J.) (opinion accepting plea); *see*

*also infra* Part I.B (describing additional counts). The criminal plea provided the United States a total recovery from BP of $4.0 billion. BP has not agreed to pay civil penalties under Section 1321(b)(7).

On February 14, 2013, Transocean pleaded guilty to a violation of the CWA, 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3), and agreed to pay $400 million in criminal penalties. *See United States v. Transocean Deepwater, Inc.*, No. 13-cr-001, Rec. Doc. 31 (E.D. La. Feb. 14, 2013). Transocean also separately entered a Consent Decree with the United Sates under which it agreed to pay a $1 billion civil penalty under CWA Section 1321(b)(7), (Feb. 19, 2013 Final Judgment [MDL 2179 Rec. Doc. 8608] at 3, 9) — the provision the District Court had found almost entirely inapplicable to Transocean as owner of the *Deepwater Horizon*. The District Court approved the Consent Decree on February 19, 2013. (Feb. 19, 2013 Final Judgment [MDL 2179 Rec. Doc. 8608].)

### E.    Proceedings in this Court.

Anadarko noticed this appeal on August 24, 2012. On September 18, 2012, the United States filed a cross-appeal against Transocean, and, on that same date, BP noticed its own appeal against the United States. On October 23, 2012, Transocean moved to dismiss the entire

appeal, contending that the District Court's order was not appealable in an interlocutory posture and that all of the notices of appeal were untimely.  On February 5, 2013, the Court denied Transocean's motion, and, shortly thereafter, in the wake of Transocean's settlement with the United States, Transocean was dismissed from the case.

As the case now stands, a single issue remains for decision — did the court err by imposing 1321(b)(7) penalty liability on BP and Anadarko as owners of the Macondo well?

## SUMMARY OF ARGUMENT

The District Court correctly recognized that Section 1321(b)(7) imposes a per-barrel-of-oil-spilled maximum penalty based on affiliations with the single instrumentality "from which" the relevant oil was discharged — be it an onshore facility, an offshore facility, or a vessel.  Having recognized that one instrumentality alone can give rise to Section 1321(b)(7) spill liability, however, the Court erred by failing to identify the correct instrumentality as the *Deepwater Horizon* vessel, from which all of the spilled oil was discharged.

**I.** Taken together, the statutory text, statutory structure, and relevant case law establish that Congress intended to impose Section

1321(b)(7) liability solely on those associated with *one* instrumentality — the vessel or facility "from which" oil was discharged.

Unlike a one-instrumentality test, the novel test proposed by the United States conflicts with the statute's plain language and could unfairly impose spill liability on an unknown number of entities down through a chain of oil production and transportation based on vague, malleable standards that, to our knowledge, the United States has never before put forward in litigation or adopted in administrative proceedings. By contrast, a one-instrumentality rule establishes an administrable regime that places penalty liability on entities like Transocean that own vessels and facilities and take custody of oil from other entities, like BP and Anadarko. Under Section 1321(b)(7), those who have custody of oil are strictly liable if they spill it. This is a simple, clear, eminently fair, statutory rule that Transocean violated in this case. **(*See* Part I.A.)**

Furthermore, the United States' appeal to common usage of the word "from" to support imposing liability on multiple vessels and/or facilities is not at all persuasive. In fact, a straightforward single-

instrumentality rule far better comports with common usage than does the United States' reading of the statute. *(See* **Part I.B.)**

Finally, comparing the CWA's penalty provisions and OPA's compensatory liability provisions confirms the correctness of a one-instrumentality reading of Section 1321(b)(7).  Unlike other CWA civil and criminal penalty provisions, which apply to "any person" who violates those provisions, Section 1321(b)(7) applies solely to an owner, operator or person in charge of the single vessel or facility that was the source of the discharge.   And unlike OPA's compensatory liability provisions, which provide that activities of MODUs like the *Deepwater Horizon* create both vessel liability for the MODU's owners (like Transocean) and facility liability for lessees of the area in which the MODU operates (like BP and Anadarko), CWA Section 1321(b)(7) provides that a MODU qualifies exclusively as a vessel — not as an offshore facility.  *(See* **Part I.C.)**

**II.** While the District Court correctly understood there could be only one source for a discharge, it erred in determining that oil was discharged, not "from" the *Deepwater Horizon*, but "from" the Macondo well.

As an initial matter, even assuming the District Court were correct that under the CWA the relevant test turns on the place "from which" an "uncontrolled movement of oil" began, it still erred as a matter of law by awarding summary judgment against BP. **(*See* Part II.A.)**

More fundamentally, the District Court applied the wrong legal standard. The touchstone for determining the single instrumentality "from which" oil is discharged is, naturally, the place "from which" it is released from the CWA vessels and facilities through which it may have passed, thus allowing it to reach water. As Judge Rosenthal recently recognized in a case involving the *Deepwater Horizon* spill, oil was released in this spill exclusively out of — that is, "from" — the *Deepwater Horizon* and its appurtenances, not from the Macondo well. Hence, Transocean as the *Deepwater Horizon*'s owner, not BP as a Macondo well owner, is liable under Section 1321(b)(7). **(*See* Part II.B.)**

In reaching its contrary result, the District Court improperly consulted its views of public policy and the equities in lieu of the CWA's plain terms. But while ownership liability for this spill rests on

Transocean, BP remains liable under other applicable provisions of law — including CWA Section 1319(c) and OPA. Indeed, BP's liabilities to date have totaled many times more than the combined liabilities of all other participants in this oil spill. Nothing in the overall CWA regime is inequitable or contrary to public policy, as the District Court appeared to fear in crafting the decision below. *(See **Part II.C.**)*

## SUMMARY JUDGMENT STANDARD

Rule 56 requires that there be "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). To ensure that there are not genuine disputes as to material fact, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion" by citing materials in the record. *Id.* 56(c).

The moving party must demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views "all evidence in a light most favorable to the non-moving party and draw[s] all reasonable inferences in favor of the non-moving party." *Jefferson Block 24 Oil & Gas, L.L.C. v. Aspen Ins. UK Ltd.*, 652 F.3d 584, 588 (5th Cir. 2011) (quotation marks omitted).

This Court reviews a district court's grant of summary judgment *de novo*, applying the same standard as the district court. *See, e.g.*, *id.*

## ARGUMENT

**I.    The District Court Correctly Held That Under Section 1321(b)(7) the Owner of a Vessel and Owner of an Offshore Well Cannot Both Be Liable for the Same Spilled Oil.**

The United States moved for summary judgment on a theory that oil was discharged concurrently "from" the Macondo well and "from" the *Deepwater Horizon*. The District Court correctly rejected this theory.

### A.    The Plain Text of the Clean Water Act Contemplates Liability Only for a Single Source "From Which" Oil Is Discharged.

The plain terms of the Clean Water Act provide that civil liability under Section 1321(b)(7) of the CWA can be imposed either based on affiliations with a vessel (like the *Deepwater Horizon*), or with a facility (like the Macondo well), but not based on both.

Section 1321(b)(7)(A) establishes liability for "the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility *from* which oil or a hazardous substance is discharged." The United States reads this text to mean that particular discharges of oil can be said to come "from" a vessel, and possibly also "from" an onshore facility, and possibly also "from" an offshore facility — all at the same

time. But the text, structure, and context of Section 1321(b)(7) indicate that a discharge may come either "from" a vessel, or "from" an onshore or offshore facility — but not from two or all three of these types of instrumentalities.

Several factors combine to make clear Section 1321(b)(7)'s single source rule. *First*, the CWA's text indicates that the discharge of each barrel of oil comes from one point of discharge. A discharge under Section 1321(b)(7) comes from a "vessel, onshore facility, *or* offshore facility." The disjunctive "or" dividing vessels from onshore facilities and offshore facilities creates separate categories of sources for discharges. *See Quindlen v. Prudential Ins. Co. of Am.*, 482 F.2d 876, 878 (5th Cir. 1973) ("[A]s a general rule, the use of a disjunctive in a statute *indicates alternatives* and requires that *those alternatives be treated separately*.") (emphasis added). The word "or" indicates Congress's intent that each discharge must come — in the alternative — from one or the other of three mutually exclusive categories.

*Second*, although case law is sparse, what case law is available confirms that Section 1321(b)(7) does not contemplate multiple sources for a single discharge. In *Shell Oil Co. v. United States*, 538 F.2d 346,

1976 WL 23839 (Ct. Cl. 1976) (table), for example, there were discharges of oil from two vessels moored to an onshore facility — a boat slip.   The boat slip owner argued in the course of pursuing an indemnification claim for cleanup costs that "because the subject vessels at the time were moored alongside its dock, situated in its slip, the spill came from its 'onshore facility' which encompasses both the dock and the slip." *Id.*   But the court held that because a vessel is not an "onshore facility," the spill came from the vessels alone. *Id.*

**Third**, to the extent there is any ambiguity, Section 1321(b) should be construed against the United States.   Notably, Section 1321(b) imposes civil penalties that are punitive in nature. *See Tull v. United States*, 481 U.S. 412, 422-23 & n.7 (1987) (explaining that a different but related civil penalty provision of the CWA "exacts punishment" and provides relief that is of a "punitive nature").   As such, Section 1321(b)(7) must be construed against the United States, for it has long been established that civil penalty statutes must be applied narrowly. *See, e.g.*, *World Ins. Co. of Omaha, Neb. v. Pipes*, 255 F.2d 464, 472 (5th Cir. 1958) ("Penalties in civil actions are not favored by the courts, and should not be imposed except in cases that are clear and

free from doubt.") (quotation marks omitted); *see also First Nat'l Bank of Gordon v. Office of Comptroller of Currency*, 911 F.2d 57, 65 (8th Cir. 1990) ("Penal provisions, even those involving civil penalties, should be strictly construed."); *United States v. One 1973 Rolls Royce*, 43 F.3d 794, 819 (3d Cir. 1994) (construing "punitive" civil forfeiture provision against United States).

That is all the more true given that Section 1321(b)(7) imposes strict liability. While exceptions to a broadly written strict-liability statute should be narrowly construed if the statutory structure so demands, *see, e.g.*, *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 756-57 (5th Cir. 2011), where a statute "imposes liability without fault within its narrowly drawn limits," those limits must be observed, *Foremost-McKesson, Inc. v. Provident Secs. Co.*, 423 U.S. 232, 251-52 (1976). "It is inappropriate to reach the harsh result of imposing [ ] liability without fault on the basis of unclear language. If Congress wishes to impose such liability, we must assume it will do so expressly or by unmistakable inference." *Id.* at 252; *see also Gollust v. Mendell*, 501 U.S. 115, 122 (1991); *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 316 (1st Cir. 1995) (reasoning that "restraint" is appropriate in

interpreting "strict liability" provisions, and "there are sound policy reasons to confine that liability to the letter of the text, narrowly construed").

Moreover, principles of fair notice also require a narrow reading of Section 1321(b)(7). Before applying civil penalties, a court must ensure that the relevant statute gives persons "fair warning of the conduct it prohibits or requires" and provides "a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Diamond Roofing v. Occupational Safety & Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976); *see also County of Suffolk, N.Y. v. First Am. Real Estate Solutions*, 261 F.3d 179, 195 (2d Cir. 2001) ("Due process requires that before a criminal sanction or significant civil or administrative penalty attaches, an individual must have fair warning of the conduct prohibited by the statute or the regulation that makes such a sanction possible."); *United States v. Approximately 64.695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) ("To provide sufficient notice, a statute or regulation must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly."); *Fabi Constr. Co. v.*

*Secretary of Labor*, 508 F.3d 1077, 1088-89 (D.C. Cir. 2007) ("Even if the Secretary's interpretation were reasonable, announcing it for the first time in the context of this adjudication deprives Petitioners of fair notice."); *United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1333 (D.C. Cir. 1995).

Importantly, the United States' briefing below failed to identify any cases under Section 1321(b)(7) imposing penalties on multiple sources for a single discharge. Nor has the United States identified prior administrative rulings or regulations giving advance notice of its expansive interpretation of Section 1321(b)(7)'s use of the word "from." (Nor, for that matter, does any prior regulatory interpretation give notice of Transocean's interpretation as adopted by the District Court.) The government should not be able to adopt new and broad theories of penalty liability for the first time in high-stakes litigation.

***Finally***, adhering to a plain-language, single-source interpretation establishes proper incentives and promises comparatively straightforward administration of Section 1321(b)(7) in future cases. In terms of fair notice and administration, a source-of-

discharge rule establishes, for every single barrel of discharged oil, a ready means for assigning potential penalty liability under Section 1321(b)(7). There may, to be sure, be some close cases, for example cases in which oil is discharged as it is being transferred from one vessel or facility to another. *Cf.* USCA5 7819 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). But such situations are surely — if not entirely hypothetical — at least extremely rare. In all the most notable oil spills to date, including this one, the discharge source has been readily apparent. Under a plain language reading, the United States will be able, except in highly unusual circumstances, to readily identify those potentially liable for paying Section 1321(b)(7) civil penalties for every barrel of oil spilled; namely, the owner, operator, and person in charge of the source of the discharge.

In terms of incentives, the logic of a source-of-discharge reading is even more compelling. Under Section 1321(b)(7), every owner, operator, or person in charge is made responsible for containing any and all oil they take custody of. Those who take custody of oil must take care not to spill the oil. And those who do spill oil will know that they will be liable for doing so — on a basis that sets a maximum penalty based on

the amount they spill.  A source-of-discharge rule encourages parties to try as best they can to ensure oil does not spill "from" *their* vessel or *their* facility.

## B.     Common Usage of "From" Confirms That Only One Source Instrumentality Should Bear Section 1321(b)(7) Liability.

According to the United States, the CWA extends liability to parties responsible for each and every source "from" which discharged oil could be said to originate.  The United States further contends that this reading comports with what it takes to be "the common usage of 'from[.]'"  *See* USCA5 6505 (Dec. 8, 2011 USA Mot. for Summ. J. [Rec. Doc. 4836-1]) (citing an Oxford English Dictionary definition).  In fact, the common usage of the word "from" confirms the correctness of a single-source-instrumentality reading of Section 1321(b)(7).

Consider for example a person whose ancestors emigrated from Spain, and who grew up in Minnesota, lives and works in Birmingham, Alabama, flies into the New Orleans airport after changing flights in Atlanta, and eats breakfast at the Windsor Court hotel in New Orleans. Such a person might conceivably name any of those places when asked later in the morning where it is he or she has come "from."  Most

assuredly, however, the person would not name *all* of them — he or she would instead choose the single place that appeared most relevant in light of the question's context and answer accordingly. *Compare* USCA5 7688-89 (Jan. 19, 2012 Hr'g Tr. [Rec. Doc. 5338]) (counsel for the United States arguing that he came to the hearing from "both" his hotel and the hallway outside the courtroom). By the same token, the best plain-language reading of the CWA is one based on an assumption that it identifies a single point for a discharge (the last exit point from a vessel or facility before the discharge entered water). In this regard, the reading of "from" embedded in the District Court's decision better comports with common usage than does the United States' reading.

Indeed, the parties in this case have exemplified how usages of "from" can vary from context to context. Since the District Court's February 22, 2012 decision, BP and the United States have executed at least two legally binding stipulations that employ the preposition "from" in describing the flow of oil during the *Deepwater Horizon* oil spill. ***First***, on January 30, 2013, Judge Vance of the Eastern District of Louisiana accepted a criminal guilty plea from BP for a misdemeanor violation of CWA Section 1319(c)(1)(A), based on BP's violation of

Section 1321(b)(3) of the Act.  BP also pleaded guilty to eleven counts of violations of 18 U.S.C. § 1115 (misconduct or neglect of ship officers), one count of a violation of 18 U.S.C. § 1505 (obstruction of Congress), and one count of a violation of 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act).  *See United States v. BP Exploration & Production Inc.*, No. 12-cr-292, Rec. Doc. 65 (E.D. La. Jan. 30, 2013) (Vance, J.) (opinion accepting plea). In the Migratory Bird Treaty Act portion of BP's guilty plea allocution, BP pleaded as follows:  "On or about and between April 20, 2010, and December 31, 2010, in the Eastern District of Louisiana and elsewhere, BP did unlawfully kill and cause to be killed one or more migratory birds . . . when defendant negligently discharged and caused to be discharged oil *from* the Macondo well." *See id.* Rec. Doc. 2-1 at 16 (emphasis added).

**Second**, on February 19, 2013, Judge Barbier entered a stipulation between the United States and BP in this civil litigation. The stipulation concerned the maximum possible penalty available under Section 1321(b)(7) for a violation of Section 1321(b)(3).  In the preamble to this stipulation, BP and United States stipulated that the oil "flowed *from* the subsurface reservoir, through the well, [and]

through the blow-out preventer." (Jan. 20, 2013 Stipulation [MDL 2179 Rec. Doc. 8620] at 1) (emphasis added).

The upshot is simply this: during the course of this litigation, the parties have used the word "from" in various ways to describe the flow of oil at issue, consistent with the fact that "from" can be employed in standard usage to mean different things in different contexts. Far from demonstrating BP's liability under Section 1321(b)(7), these varied uses demonstrate that "statutory context" matters more than "definitional possibilities." *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000).

C.     **The United States' Position Conflates the Clean Water Act's Definitions of "Vessels" and "Facilities" and Is Unworkable in Practice.**

The importance of maintaining the statute's distinction between discharges from vessels and from offshore facilities is underscored by the potential for inequities and near certainty of practical difficulties inherent in the United States' reading of the statute, as well as by the CWA's calibrated remedial regime and mutually exclusive definitions of "vessels" and "offshore facilities."

Reviewing all the CWA's penalty provisions confirms the correctness of a single-instrumentality reading of Section 1321(b)(7). Unlike other CWA civil and criminal penalty provisions, which apply to "any person," Section 1321(b)(7) applies solely to an owner, operator or person in charge of a vessel or facility "from which" there was a discharge of oil or hazardous substances.

Comparing Section 1321(b)(7) to OPA's compensatory liability provisions further confirms the single-instrumentality reading. As noted above, the CWA ensures there is no possibility of definitional overlap between "vessels" and "facilities" by specifically defining "offshore facility" in a manner that excludes vessels. *See* 33 U.S.C. § 1321(a)(11) (defining "offshore facility" as "any facility of any kind located" offshore "*other than a vessel*") (emphasis added).

OPA, by contrast, establishes an overlapping categorization scheme for MODUs like the *Deepwater Horizon* — one providing they will always be vessels and sometimes be offshore facilities as well. *See* 33 U.S.C. § 2701(18) (defining "mobile offshore drilling unit" as "a vessel (other than a self-elevating lift vessel) *capable of use as an offshore facility*") (emphasis added). Accordingly, when a MODU is

50

engaged in drilling activities vis-à-vis a well it becomes two things at once — both a vessel and an offshore facility. And if a discharge happens to occur (as here) at a time when a MODU is connected to a well in the course of drilling activities, the MODU constitutes both a vessel and an offshore facility for OPA purposes — thus subjecting both the owner of the MODU vessel and the lessee of the area in which the MODU facility is located to compensatory liability as OPA responsible parties. *See* 33 U.S.C. § 2701(32)(C). This marked contrast between the CWA and the OPA highlights an important point: When Congress wishes to make parties associated with multiple instrumentalities liable for a single discharge, it knows how to do so. Clearly, Congress chose not to do so in the Clean Water Act.

Finally, it bears emphasis that the United States' insistence on multiple answers to the "from" question carries real-world significance. Consider the following hypothetical scenario — oil is (i) produced from an offshore well and then sent (ii) through a subsea pipeline (iii) to an offshore oil terminal and from there (iv) to a tanker vessel, (v) an onshore oil terminal, (vi) a land-based oil pipeline, and (vii) railroad tanker cars, ending, ultimately, in (viii) an oil storage tank at a oil

refinery from which a month later it is spilled.   Under the United States' statutory construction, it would appear this hypothetical oil discharge could be said to be "from" not only the tank at the refinery but also "from" the seven prior links in this illustrative (but not unrealistic) chain of oil production and transportation activity.   To be sure, the *Deepwater Horizon* was just the second link in the chain of facilities and vessels relevant here.   But nothing requires that oil spills occur shortly after oil comes out of the ground or seabed.   The statutory test established for Section 1321(b)(7) must as easily accommodate an eight-link activity chain as a two-link chain.

In sum, the United States contended below for an unworkable test that is at odds with the statutory language and fails to account for Section 1321(b)(7)'s place in the larger remedial scheme.   The District Court correctly concluded that Section 1321(b)(7) imposes per-barrel penalty liability based on affiliations with one and only one vessel or facility.

## II.   The District Court Nonetheless Incorrectly Granted Summary Judgment Against BP.

Having correctly determined that Section 1321(b)(7) penalties may be imposed on only one vessel or facility owner for any given instance of

a spilled barrel of oil (and not both at once), the District Court erred in granting summary judgment against BP and Anadarko and in favor of the United States.  For one thing, even under the District Court's liability test, material facts remain in dispute and summary judgment was improper.  But more importantly, the District Court reformulated the statute in view of its sense of the equities and in doing so applied a wrong legal standard.

### A. Even Under the District Court's Mistaken Test for Determining the Single Discharge Source, Material Facts Remain in Dispute.

Even assuming that the District Court stated the proper test for assigning Section 1321(b)(7) penalty liability — namely, "where the uncontrolled movement of oil began" — critical facts remained in dispute, such that summary judgment was improper under Rule 56.

***First***, the United States did not even move against BP on this ground.  The United States therefore submitted no evidence — and the Court identified none — to support a conclusion that the "uncontrolled movement of oil began in the well."  USCA5 7816 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]).

To be sure, with respect to any well, hydrocarbon flows always should be carefully monitored and managed lest a blowout occur. For that reason, the drill crew of a drilling rig should pay careful attention at all times and take any intervention steps necessary when they detect a pressure increase, or "kick," representing a flow of hydrocarbons into the well. That said, had the United States relied on a liability theory dependent on where "uncontrolled" oil movements "began," BP would have cited record evidence demonstrating that any "kick" or hydrocarbon flow into the Macondo well became "uncontrolled" only after hydrocarbons had flowed *past* the *Deepwater Horizon* BOP (a primary purpose of which is to secure and thus "control" hydrocarbon flows by acting as a barrier), into the riser, and onto the *Deepwater Horizon* itself. Indeed, another "kick" took place at the Macondo well on March 8, 2010, but the March 8 kick did not cause a blowout. That is because the *Deepwater Horizon* crew was able to respond to the March 8 kick, unlike the April 20 kick, by using the BOP to shut the well in a proper and timely manner before hydrocarbons escaped beyond the BOP and into the *Deepwater Horizon*'s riser.

***Second***, there is no record evidence supporting the District Court's finding that a blowout preventer is a mere "passive conduit." A BOP is, rather, an active piece of well control equipment that serves as a barrier to hydrocarbon flow. Indeed, the failure of the *Deepwater Horizon*'s BOP to seal the oil flow on April 20 was a direct cause of the blowout and the subsequent oil spill. As the District Court recognized, the causes of this well blowout include that the BOP did "not control the flow of hydrocarbons." *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-2179, 2011 WL 4829905, at *6 (E.D. La. Oct. 12, 2011).

Federal regulations and case law confirm that a blowout preventer is not a passive conduit but an active, controllable barrier designed to prevent the flow of hydrocarbons out of a well. *See, e.g., Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 230-31 (S.D.N.Y. 2012) ("A BOP is a stack of valves that operates as a failsafe device designed to stop a blowout from progressing and, in the event of loss of control, seal the well and stop the flow of oil."); *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 202 (S.D.N.Y. 2012) ("The BOP is equipped with multiple means of

controlling well pressure."); *Nat'l Oilwell Varco, LP v. Hydril Co., LP*, No. 06-170, 2011 WL 467119, at *1 (S.D. Tex. Feb. 5, 2011) ("Blowout preventers are used in drilling oil wells to control pressure . . . .").

Numerous governmental investigations and reports have also concluded that a BOP is not intended as a "passive conduit," as the District Court found below, but instead serves as an active, controllable barrier to hydrocarbon flow. *See, e.g.*, Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling (Final Report)* 114 (2011) ("The BOP is designed to . . . halt an uncontrolled flow of hydrocarbons to the rig. The *Deepwater Horizon*'s BOP did not succeed in containing the Macondo Well."); Nat'l Comm'n on the BP Deepwater Horizon Oil Spill & Offshore Drilling, *Macondo: The Gulf Oil Disaster (Chief Counsel's Report)* 203 (2011) ("[A BOP is] designed to shut in a well in case of a kick, thereby 'preventing' a blowout."); Bureau of Ocean Energy Mgmt., Regulation & Enforcement, *Report Regarding the Causes of the April 20, 2010 Macondo Well Blowout* 4 (2011) ("[O]n April 20, the BOP stack failed to seal the well to contain the flow of hydrocarbons.").

***Third***, the District Court relied on an assumption that the CWA is "designed to 'place[] a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same.'" USCA5 7817 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]) (quoting *Coastal States Crude*, 643 F.2d at 1128). But the case cited by the District Court holds only that it is appropriate to impose penalty liability upon the owner of a pipeline from which oil indisputably was discharged. *Id*. Neither *Coastal States Crude* nor any other decision holds that the goal of maintaining clean water so important that Section 1321(b)(7) liability should be imposed contrary to the terms of the statute. Nor did *Coastal States Crude* have occasion to consider that Section 1321(b)(7) stands in contrast to the OPA in its failure to impose liability on the lessees of oil fields where oil spills occur.

**B.      Under a Proper Interpretation of Section 1321(b)(7), BP Cannot Be Liable as the Owner of the Macondo Well Because the Well Was Not the Source "from which" Oil Was Discharged.**

At any rate, this Court should reverse the District Court's order of summary judgment because its "uncontrolled movement of oil" interpretation is premised on an incorrect reading of Section 1321(b)(7).

As discussed above, Section 1321(b)(7)'s phrase "from which oil . . . is discharged" properly refers to a point of discharge — not the oil's origin, but the place from which oil is released.   Here relevant oil was discharged from the *Deepwater Horizon* and its appurtenances, not from the Macondo well.

In the context of a statute named the Federal Water Pollution Control Act, and commonly known as the Clean Water Act, a discharge naturally is read to denote a point of exit into the environment of pollutants that eventually reach water.   Indeed, until oil enters the environment, there is no "discharge" at all, whether the oil is in "uncontrolled movement" or not.   Put another way, even though the exact meaning of "from" may be context-specific — and can refer to points of ultimate origin, points of intermediate origin, points of immediate departure, and potentially anything in between — Section 1321(b)(7)'s context indicates that "from" for purposes of the provision means the point from which oil exits the confinement of any vessel or facility before reaching navigable waters.   *See, e.g.*, VI OXFORD ENGLISH DICTIONARY 210-11 (2d ed. 1989) (defining "from," *inter alia*, as "Denoting departure or moving away from").   Any uncontrolled

58

movement of oil within the Macondo well became a "discharge" only at the point when and where containment of the oil within any vessel or any facility was lost and the oil was released.

The specific terms of the CWA's discharge prohibition confirm what the "from" definition and the Act's formal and common names suggest. Section 1321(b)(3)'s prohibition on discharges encompasses only those oil releases that occur "in such quantities as may be harmful as determined by the President[.]" 33 U.S.C. § 1321(b)(3). But EPA has determined (and provided fair notice of the point consistent with *Diamond Roofing*) that discharges are harmful only if they "[v]iolate applicable *water* quality standards" or "[c]ause a film or sheen upon or discoloration of *the surface of the water or adjoining shorelines*[.]" 40 C.F.R. § 110.3 (emphasis added). Until oil enters in or "upon" water, in other words, its release does not come within the CWA's regulatory ambit.

Cases involving transfers of oil from one place to another have accordingly focused on the place oil enters the environment — not on the oil's ultimate source. For example, when oil is spilled from a pipeline, liability under the CWA attaches to the pipeline owner, not the

owners of the facilities at either end.  *Coastal States Crude*, 643 F.2d at 1127.

In this case, there is no dispute that the relevant oil was spilled solely out of the *Deepwater Horizon* and its appurtenances.  As the government stated below, the discharged oil entered the water "from the *Deepwater Horizon*" after the explosion, and later "from the broken riser pipe and/or BOP after the *Deepwater Horizon's* sinking."  *See* USCA5 6523 (Dec. 8, 2011 USA Statement of Facts [Rec. Doc. 4836-2] ¶ 15).  Even Transocean, although it argued that the BOP was only a "conduit" for oil — a claim about which there are, as discussed above, hotly disputed questions of fact — nonetheless agreed against its interest that oil was discharged "through the BOP and riser into the Gulf of Mexico."  *See* USCA5 6966 (Jan 9, 2012 Transocean Statement of Facts [Rec. Doc. 5103-1] ¶ 16).

In contrast, no party has contended that any oil was discharged into the Gulf of Mexico directly from the well itself.  The District Court's uncontrolled movement theory therefore implies that, although no oil coming "from" the Macondo well was "discharged" from the well, the "discharge" nevertheless came "from" the Macondo well because the oil

passed through the well after issuing from the reservoir but before discharging from the *Deepwater Horizon* and its appurtenances. This theory is not tenable. It is undisputed that the only oil ever to escape confinement and reach water escaped from the *Deepwater Horizon* and its appurtenances and that only oil that reaches water is capable of creating a "film or sheen upon or discoloration of the surface of water" as is required to trigger Section 1321(b)(7) liability.

Significantly, another district court in this Circuit recently rejected an argument along lines similar to the one Transocean advocated and the District Court adopted in this case. In *United States v. Transocean Deepwater Drilling Inc.*, ___ F. Supp. 2d ___, 2013 WL 1345246 (S.D. Tex. Mar. 30, 2013), Judge Rosenthal considered Transocean's attempt to evade the investigational jurisdiction of the United States Chemical Safety and Hazard Investigation Board ("CSB"). Transocean argued that "the Macondo incident involved a naturally occurring hydrocarbon reservoir" and that the *Deepwater Horizon* therefore did not constitute a "stationary source" of air pollution during the two days when it was burning. *See* 42 U.S.C. § 7412(r)(6)(C)(i), (r)(2)(A) (authorizing the CSB to investigate releases

of regulated substances "from a stationary source"); 40 C.F.R. § 68.3 (providing that "[a] stationary source does not include naturally occurring hydrocarbon reservoirs").    The court gave Transocean's argument short shrift.  Rejecting the contention that the burning gases came from the Macondo reservoir, the court found that the "relevant stationary *source* was the *Deepwater Horizon* and its subsea riser, which allowed the naturally occurring hydrocarbon reservoir to blowout, explode up through the rig, and release gases into the air." *Transocean Deepwater Drilling*, 2013 WL 1345246, at *8 n.2 (emphasis added).

In reaching a contrary conclusion the District Court found precedential support almost exclusively in the Second Circuit's decision in *Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180 (2d Cir. 2010).  *Peconic Baykeeper*, which involved releases of pesticides into the air by county-owned spraying vehicles, thus merits careful reading.

The CWA provisions at issue in *Peconic Baykeeper* were not Section 1321(b)(7), but a CWA section that defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12), and the CWA's definition of

"point source" as "any. . . conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The defendant there argued on the basis of these definitions that, because it had sprayed pesticides only into the air, not directly to water, its vehicles were not "point sources." The Second Circuit rejected the argument, reasoning that "[t]he pesticides were discharged 'from' the source, and not from the air." 600 F.3d at 188.

Here, the District Court implicitly analogized a release of pesticides first into the air and from there into water to a flow of oil first from the Macondo well into the *Deepwater Horizon* and its appurtenances and from there into the Gulf. USCA5 7815-16 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). But the analogy was mistaken.

The *Deepwater Horizon* is a vessel as defined by the CWA. As such, the *Deepwater Horizon* is not at all like the un-owned medium of the open air, a constituent of the natural environment. There is no owner, operator, or person in charge of the atmosphere that may be held strictly liable for discharges "from" the atmosphere that eventually reach water. For purposes of making liability assignments, releases of oil from an offshore facility through a sealed juncture and into an

63

interconnected vessel like the *Deepwater Horizon*, and from there to water, are quite different from releases into water from the open, un-owned, ambient air.

Closely related to its mistaken analogy between the *Peconic Baykeeper* spraying and *Deepwater Horizon* spill was the District Court's related concern over the fact, *see supra* Background B., that for a short interval between July 13 and 15, 2010, the *Deepwater Horizon*'s discharges reached water after passing through capping equipment placed atop the *Deepwater Horizon* BOP as part of the massive, government-directed, spill-response effort. *See* USCA5 7816 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). The court's evident concern was whether the emplacement of this equipment between the *Deepwater Horizon* BOP and riser and Gulf of Mexico displaced the *Deepwater Horizon* as the instrumentality "from which" oil was being discharged.

This liability riddle is readily solved, however, by consulting the statute. Section 1321(b)(7) assigns liability to "vessels" and "facilities" "from which" oil is discharged. Government-controlled spill-response equipment is not a typical oil-production- or transportation-related vessel or facility. Practically speaking, this equipment served (in

addition to other purposes) as a new set of valves to control flow and shut in the well — a job the original *Deepwater Horizon* BOP valves had been assigned but failed to perform. Legally speaking, it does not matter whether one regards this equipment as replacement parts for a malfunctioning *Deepwater Horizon* BOP, or as part of the manmade environment not constituting a vessel or facility, or as a mini-vessel or mini-facility immune from bearing liability because it was part of the government's response effort. However categorized, flows through this equipment, like flows through the atmosphere in *Peconic Baykeeper*, cannot give rise to a new bearer of Clean Water Act penalty liability. The emplacement of this working equipment could not displace the *Deepwater Horizon* as the discharging instrumentality — the vessel "from which" all relevant oil was released.

## C. Assigning Per-Barrel Civil Penalty Liability Solely to a Vessel Owner Like Transocean Is Consistent with Reasonable Congressional Policy and the Equities.

In the end, the District Court's assignment of liability may have arisen significantly, perhaps predominantly, from a view that Anadarko and BP ought to be held liable as a matter of sound public policy:

> *Anadarko and BP were the ones directly engaged in the enterprise which caused the spill.* They were the mineral

65

>lessees, they owned the well, *and they stood to profit* directly from the oil it produced.  *Thus, Congress intended that the cost of pollution would be borne by these parties.*  By contrast, Transocean … did not stand to profit directly from the oil.

USCA5 7817 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]) (emphasis added).

As an initial matter, consulting the perceived demands of public policy is misplaced where, as here, the language of a statute so clearly answers the legal question at issue.  In *Cooper Indus., Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004), the Supreme Court declined to interpret the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), as allowing contribution claims not only by parties who conduct environmental cleanups after being sued by the government, but also by parties who undertake cleanups voluntarily.  Brushing aside arguments that broader contribution rights are appropriate as a matter of equity or because voluntary cleanups should be encouraged, the Supreme Court took its cue instead from "the clear meaning of the text."  *Id.* at 167.  The Court admonished that there was no need to "consult the purpose of CERCLA at all," for "[i]t is ultimately the provisions of our laws rather than the principal concerns of our

legislators by which we are governed." *Id.* at 167-68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79 (1998)).

The District Court's public policy concerns were similarly misplaced. Here, the CWA's plain language, together with its interlocking structure with the OPA, leave no doubt about how Congress intended for the two statutes to work in tandem to parcel out compensatory and punitive liability for oil spills. The result is a fair, effective, administrable combination of remedies that can be deployed, as they have been against BP, to ensure that parties not encompassed by Section 1321(b)(7) nonetheless remain financially accountable for the roles they may play in oil spills.

Indeed, even though it may not recover from BP under Section 1321(b)(7), the United States and other parties enjoy ample alternative avenues for pursuing BP. BP early on waived its statutory right to a cap on its OPA compensatory liabilities and has since paid or committed enormous sums as a result of the *Deepwater Horizon* incident. Moreover, should this Court determine that equitable considerations are relevant, BP would be prepared to show that BP has paid out or committed over $24 billion as a result of this oil spill through the third

67

quarter of 2012 — a figure that continues to rise. This large sum broadly represents costs of responding to the oil spill and making compensatory payments under OPA and other laws unrelated to any criminal liability or potential civil penalty under Section 1321(b)(7). Among the types of costs encompassed by this figure are payments and reimbursements related to spill response costs; payments to individuals, businesses, and governments through the Gulf Coast Claims Facility (an entity BP established and administered to speed the pre-litigation payment of claims); payments through the uncapped settlements in private litigation covering certain economic loss and medical claims; over $600 million spent to date on assessing environmental impacts; $1 billion that BP has set aside for environmental restoration projects, $500 million in commitments to fund research activities; and over $200 million to Louisiana, Alabama, Mississippi, and Florida for restoring local industries.

In marked contrast, to the best of BP's knowledge, no other party to the spill has voluntarily waived OPA's cap on compensatory liabilities. And although BP cannot know for certain how much other parties have paid in compensation for spill-related claims, BP's own

payments — over $24 billion and counting — almost surely dwarf those any other single party, and even those of all other parties combined.

In addition to paying over $24 billion in civil compensation claims, BP agreed in the guilty plea described above to pay a criminal recovery of $4.0 billion — the largest criminal penalty ever, and more than three times the value of the next-largest criminal resolution. Transocean, in contrast, agreed to pay $400 million in total criminal penalties for its role in the *Deepwater Horizon* spill.

Against this backdrop, the District Court's statutory interpretation, done perhaps in the belief that parties like BP that "profit directly" from oil production would otherwise unjustly escape responsibility, is not well founded. USCA5 7817 (Feb. 22, 2012 Dist. Ct. Order [Rec. Doc. 5809]). Most importantly, the District Court simply had no warrant for departing from the statute. The CWA itself defines the parties and conduct it encompasses. By departing from the statute and crafting novel liability rules based on where an "uncontrolled" oil movement was initiated, the Court effectively substituted a form of negligence liability for the strict liability provided for by statute.

Equitable concerns, however valid, can never justify such judicial departures from a statute's plain terms.

But in any event no equitable departures from Section 1321(b)(7)'s plain terms are warranted. The statute as written ensures that for every discharge of every barrel of oil — whatever other compensatory and punitive liability might be available — the United States will be able to readily identify and pursue the parties associated with the single instrumentality "from which" that oil was discharged. And, as BP's payment history bears out, Section 1321(b)(7) does not replace other Clean Water Act and Oil Pollution Act remedies; it complements them. Even if and when Section 1321(b)(7) is applied as written to exclude BP from 1321(b)(7) ownership liability, BP will continue to bear by far the heaviest financial burdens arising from the *Deepwater Horizon* spill.

# CONCLUSION

For these reasons, the judgment of the District Court should be reversed.

April 26, 2013                                    Respectfully submitted,


                                                  /s/ Richard C. Godfrey, P.C.
Robert R. Gasaway                                 Richard C. Godfrey, P.C.
Jeffrey Bossert Clark                             J. Andrew Langan, P.C.
Aditya Bamzai                                     KIRKLAND & ELLIS LLP
Stephen S. Schwartz                               300 North LaSalle Street
KIRKLAND & ELLIS LLP                              Chicago, Illinois  60654
655 Fifteenth Street, N.W.                        Telephone: (312) 862-2000
Washington,  D.C. 20005
Telephone: (202) 879-5000


Joel M. Gross                                     Don K. Haycraft
Allison B. Rumsey                                 LISKOW & LEWIS
ARNOLD & PORTER LLP                               701 Poydras Street, Suite 5000
555 Twelfth Street, NW                            New Orleans, Louisiana  70139
Washington, D.C.  20004                           Telephone: (504) 581-7979
Telephone:  (202) 942-5000


*Counsel for BP Exploration & Production Inc.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,974 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Century Schoolbook.


/s/ Stephen S. Schwartz
Stephen S. Schwartz

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing BP'S Opening Brief on Appeal was filed electronically on April 26, 2013, and will, therefore, be served electronically upon all counsel who are registered in the CM/ECF system.  I further certify that the foregoing will be served by U.S. mail on the following:

> Deborah D. Kuchler
> Kuchler, Polk, Schell, Weiner & Richeson, L.L.C.
> Suite 1300
> 1615 Poydras Street
> New Orleans, LA 70112
>
> Ky E. Kirby
> Bingham McCutchen, L.L.P.
> 2020 K. Street, N.W.
> Washington, DC 20006

> /s/ Stephen S. Schwartz
> Stephen S. Schwartz

## CERTIFICATE OF COMPLIANCE WITH ECF RULE A(6)

1. This brief complies with Fifth Circuit Rule 25.2.13 because all required privacy redactions have been made.

2. The electronic submission of this brief complies with Fifth Circuit Rule 25.2.1 because it is an exact copy of the paper document.

3. This document has been scanned for and is free of viruses.


/s/ Stephen S. Schwartz
Stephen S. Schwartz