No. 12-30883

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

*In Re: Oil Spill by the Oil Rig "Deepwater Horizon"*
*in the Gulf of Mexico on April 20, 2010*

UNITED STATES OF AMERICA,
                                        Plaintiff-Appellee,


-v.-


B.P. EXPLORATION & PRODUCTION INCORPORATED; ANADARKO
PETROLEUM CORPORATION,
                                        Defendants-Appellants

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
(HON. CARL J. BARBIER)

---

**ANSWERING BRIEF OF THE UNITED STATES, PLAINTIFF-APPELLEE**

---

ROBERT G. DREHER
Acting Assistant Attorney General

STEVEN O'ROURKE
MAGGIE B. SMITH
ELLEN J. DURKEE
Attorneys, U.S. Dep't of Justice
 Env't & Natural Resources Div.
 P.O. Box 7415 (Ben Franklin)
 Washington, DC 20044
 (202) 514-4426
 ellen.durkee@usdoj.gov

i

## STATEMENT REGARDING ORAL ARGUMENT

The United States concurs with Appellants that oral argument will likely aid this Court's resolution of the issues presented by this appeal.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

GLOSSARY....................................................................................... xii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUE................................................................2

STATEMENT OF THE CASE..................................................................2

STATEMENT OF FACTS ......................................................................4

      I.    STATUTORY BACKGROUND.....................................................4

      II.   DEEPWATER DRILLING BACKGROUND ....................................8

      III.  UNDISPUTED FACTS ESTABLISHING THE WELL OWNERS' CWA PENALTY LIABILITY............................................................10

      IV.  DISTRICT COURT PROCEEDINGS..................................................13

            A.   THE DISTRICT COURT'S FEBRUARY 22, 202, ORDER ON LIABILITY................................................................................13

            B.   CONSENT DECREE RESOLVING CWA CLAIM AGAINST TRANSOCEAN ...........................................................................16

STANDARD OF REVIEW .....................................................................17

SUMMARY OF ARGUMENT .................................................................17

ARGUMENT .........................................................................................20

      I.    BP AND ANADARKO ARE LIABLE FOR CWA CIVIL PENALTIES AS OWNERS OF THE WELL .....................................20

A.   THE CWA IMPOSES STRICT LIABILITY FOR CIVIL PENALTIES....20

B.   UNDISPUTED FACTS ESTABLISH ALL OF THE ELEMENTS FOR IMPOSING CWA CIVIL PENALTIES ON THE OWNERS OF THE MACONDO WELL ......................................................................22

II.   BP'S AND ANADARKO'S ARGUMENTS FOR EVADING PENALTY LIABILITY ARE MERITLESS .....................................26

A.   THE WELL OWNER'S SINGLE SOURCE INTERPRETATION OF SECTION 311(B)(7)(A) IS INCORRECT .......................................27

1.   The Word "Or" in Section 311(b)(7) Is Not Properly Interpreted as Exclusionary and Limiting ......................28

2.   The Well Owners' Interpretation Is Wrong Because the MODU Was in Use as an Offshore Facility...................35

B.   ANADARKO'S CONTENTION THAT THE FLOW FROM THE WELL WAS LAWFUL AND NOT A DISCHARGE THAT VIOLATED SECTION 311(B)(3) IS MERITLESS...........................................................39

1.   The CWA Does Not Forbid Only So-Called "Direct" Discharges....................................................................40

2.   The Discharge Cannot Reasonably Be Characterized as Movement from One Container to Another or as a Transfer of Cargo...........................................................45

C.   ANADARKO'S AND BP'S POLICY AND EQUITABLE ARGUMENTS ARE UNAVAILING AND UNPERSUASIVE......................................49

D.   THE STATUTE IS NOT AMBIGUOUS AND THEREFORE CANONS ON WHICH ANADARKO AND BP RELY ARE INAPPLICABLE..............52

iv

F.    THERE IS NO NEED TO REMAND FOR FURTHER
      FACT-FINDING ............................................................54

CONCLUSION .........................................................................55

CERTIFICATE OF SERVICE ................................................56

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................57

CERTIFICATE OF COMPLIANCE WITH ECF RULE A(6).............................58

v

# TABLE OF AUTHORITIES

**Cases:**

*Barber v. Thomas*,
　　130 S. Ct. 2499 (2010)........................................................53

*Buffalo Marin Service Inc. v. U.S.*,
　　663 F.3d 750 (5th Cir. 2011) ...........................................34

*Chevron, U.S.A. v. Yost*,
　　919 F.2d 27 (5th Cir. 1990) ...............................................6

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
　　467 U.S. 837 (1984)...........................................................22

*Dague v. City of Burlington*,
　　732  F. Supp.2d 458 (D. Vt. 1989), *af''d,* 935 F.2d 1343 (2d Cir. 1991),
　　*Rev'd on other grounds*, 505 U.S. 557 (1992) ..............................40

*DePierre v. United States*,
　　131 S. Ct. 2225 (2011)........................................................53

*El Fenix dePuerto Rico v. M/Y JOHANNY*,
　　36 F.3d 136 (1st Cir. 1994)..............................................17

*Farbwerke Hoeschst A.G. v. M/V "Don Nicky,"*
　　589 F.2d 795 (5th Cir. 1979) .........................................17

*Friends of Sakonnet v. Dutra*,
　　738 F. Supp. 623 (D.R.I. 1990) ...............................28, 35

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*,
　　528 U.S. 167 (2000)...........................................................51

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*,
   808 F. Supp.2d 943 (E.D. La. 2011) ........................................................25

*Liberian Poplar Transports Inc. v. United States*,
   26 Cl. Ct. 223 (Cl. Ct. 1992) ...................................................................48

*New York v. EPA*,
   443 F.3d 880 (D.C. Cir. 2006)..................................................................29

*Peconic Baykeeper, Inc. v. Suffolk County*,
   600 F.3d 180 (2d Cir. 2010) ....................................................................43

*Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*,
   322 F.3d 847 (5th Cir. 2003) ...................................................................17

*Qunidlan v. Prudential Ins. Co. of Am*,
   482 F. 2d 876 (5th Cir. 1973) ..................................................................31

*Rapanos v. United States*,
   547 U.S. 715 (2006)..................................................................................40

*San Francisco Baykeeper v. W. Bay Sanitary Dist.*,
   791 F. Supp.2d 719 (N.D. Cal. 2011).......................................................41

*Shell Oil Co. v. United States*,
   538 F.2d 346 (Ct. Cl. 1976).................................................................33, 34

*Sierra Club v. Abston Construction Co., Inc.*,
   620 F.2d 41 (5th Cir. 1980) ...............................................................24, 41

*Sierra Club v. El Paso Gold Mines, Inc.*,
   421 F.3d 1133 (C.A.10 2005)...................................................................40

*South Fla. Water Management Dist. v. Miccosukee Tribe*,
   541 U.S. 95 (2004)....................................................................................42

vii

*State of New York v. EPA,*
    443 F.3d 880 (D.C. Cir. 2006).........................................................29

*United States v. Approximately 64.695 Pounds of Shark Fins,*
    520 F.3d 976 (9th Cir. 2008) ........................................................55

*United States v. Chotin Transp., Inc.,*
    649 F. Supp. 356 (S.D. Ohio 1986) ...........................................48

*United States v. Coastal States Crude Gathering Co.,*
    643 F.2d 1125 (5th Cir. 1981) ...............................................20, 21

*United States v. Earth Sciences, Inc.,*
    599 F.2d 368 (10th Cir. 1979) ......................................................31

*United States v. Esso Standard Oil Co.,*
    375 F.2d 621 (3d Cir. 1967) .........................................................41

*United States v. Gonzales,*
520 U.S. 1 (1997)...........................................................................29

*United States v. Jones,*
    267 F. Supp. 2d 1349 (M.D. Ga. 2003)..................................23, 41

*United States v. Lambert,*
    915 F. Supp. 797, 802 (S.D. W.Va. 1996) ...................................41

*United States v. LeBeouf Bros. Towing Co.,*
    621 F.2d 787 (5th Cir. 1980) .................................................34,41

*United States v. Lucas,*
    516 F.3d 316 (5th Cir. 2008) .......................................................42

*United States v. M/V Big Sam,*
    681 F.2d 432 (5th Cir. 1982) .................................................30, 31

viii

*United States v. Ortiz*,
    427 F.3d 1278 (10th Cir. 2005) .......................................................40

*United States v. Pruett*,
    681 F.3d 232 (5th Cir. 2012) ........................................................53

*United States v. Tex-Tow, Inc.*,
    589 F.3d 1310 (7th Cir. 1978) .......................................................21

*United States v. The Catherine*,
    116 F. Supp. 668 (D. Md. 1953), *aff'd*, 212 F.2d 89 (4th Cir. 1954)............48

*United States v. Velsicol Chemical Corp.*,
    438 F.Supp. 945 (W.D.Tenn.1976) ...............................................40

*World Ins. Co. of Omaha, Neb. v. Pipes*,
    255 F.2d 464 (5th Cir. 1958) ........................................................52

## STATUTUES:

Clean Water Act
    Pub. L. No. 91-224 § 11, 84 Stat. 91 (1970) ....................................5
    Pub. L. No. 92-500 §311, 86 Stat. 816 (1972) .................................5
    33 U.S.C. 1161(i)(1) (1970) ........................................................33
    33 U.S.C. 1251(a) ....................................................................4
    33 U.S.C. 1311(a) ..................................................................4, 41
    33 U.S.C. 1319(a)(3) ...............................................................31
    33 U.S.C. 1319(c) ....................................................................52
    33 U.S.C. 1321(a)(2) ............................................................6, 23
    33 U.S.C. 1321(a)(3) ...........................................................29, 36
    33 U.S.C. 1321(a)(7) ...............................................................22
    33 U.S.C. 1321(a)(10) .............................................................34
    33 U.S.C. 1321(a)(11) .......................................................22, 36, 37
    33 U.S.C. 1321(b).................................................1, 7, 20, 26, 41
    33 U.S.C. 1321(b)(1) ..........................................................20, 25
    33 U.S.C. 1321(b)(3) ...........................3, 5, 6, 17, 20 - 22, 25 – 28, 30, 33, 39
                                                           40, 43, 49, 52, 53

33 U.S.C. 1321(b)(3)(i) ...............................................25, 40, 41
33 U.S.C. 1321(b)(3)(ii) ...............................................5, 25, 44
33 U.S.C. 1321(b)(7) ...............................................................2
33 U.S.C. 1321(b)(7)(A)-(E) ..................................................1
33 U.S.C. 1321(b)(7)(A)............................. 3, 6, 7, 14,19, 21, 22, 27-32, 35,
36, 38, 39, 50 - 52, 54
33 U.S.C. 1321(b)(7)(D) ...............................................5, 7, 22
33 U.S.C. 1321(b)(8) ...............................................5, 7, 22, 50
33 U.S.C. 1321(i)(1) ..........................................................33, 34
33 U.S.C. 1321(n) ....................................................................1
33 U.S.C. 1321(s) .....................................................................7
33 U.S.C. 1321(t) .....................................................................7
33 U.S.C. 1321(t)(1) ................................................................8
33 U.S.C. 1321(t)(2) ................................................................8
33 U.S.C. 1329(c)(1)(A) .........................................................17
33 U.S.C. 1362(12)...................................................................4
33 U.S.C. 1362(12)(B) .......................................................37, 38
33 U.S.C. 1362(14) ..................................................................5

Gulf Coast States Act of 2012 (RESTORE Act),
Pub. L. No. 112-141, 126 Stat. 588 .................................................7

Oil Pollution Act of 1990
33 U.S.C. 2701 *et seq.* ........................................................2, 5
33 U.S.C. 2701(9)...................................................................22
33 U.S.C. 2701(18)....................................................11, 35, 37
33 U.S.C. 2701(22)..................................................................36
33 U.S.C. 2701(a)(37) .............................................................36
33 U.S.C. 2702(a) ........................................................13, 15, 50
33 U.S.C. 2704(c) ...................................................................49
33 U.S.C. 2717........................................................................1

Outer Continental Shelf Lands Act
43 U.S.C. 1331 *et seq.* ....................................................5, 6, 20
43 U.S.C. 1333(a) .....................................................................6
43 U.S.C. 1334...........................................................................6
43 U.S.C. 1349...........................................................................1
43 U.S.C. 4536...........................................................................1

x

28 U.S.C. 1292(a)(3) ................................................................1, 17
28 U.S.C. 1331 ...............................................................................1
28 U.S.C. 1333 ...............................................................................1
28 U.S.C. 1345 ...............................................................................1
28 U.S.C. 1355 ...............................................................................1
28 U.S.C. 2201 *et seq* ..................................................................2

## RULES and REGULATIONS:

30 C.F.R. 250.105 (2009) ...........................................................38

30 C.F.R. Pt. 250 ...........................................................................6

40 C.F.R. 110.3 .............................................................................6

40 C.F.R. 122.3(a) .........................................................................5

40 C.F.R. 19.4 ...............................................................................7

44 Fed. Reg. 32854 (June 7, 1979) .........................................5, 38

Fed. R. App. P. 4(a)(1)(B) ...........................................................1

Fed. R. App. P. 4(a)(7)(A)(ii) ......................................................1

Fed. R. Civ. P. 56(c) ...................................................................17

Federal Practice and Procedure § 3927 (2d ed.) .......................17

## LEGISLATIVE HISTORY:

H.R. Rep. No. 91-940, 91st Cong., 2d Sess. at 34 (1970) (Conf. Rep.)......23, 32, 38

H.R. Conf. Rep. No. 95-830, 95th Cong., 1st Sess. 91 (1977) *reprinted in* 1977
      U.S.C.C.A.N. 4424 ...............................................................43, 44

H.R. Rep. No. 101-653, 101st Cong., 2d Sess. at 101-102 (1990) (Conference Report), *reprinted in* 1990 U.C.C.A.N. 779 (1990) ................................36, 51

S. Rep. No. 101-94, 101st Cong., 1st Sess. (1989), *reprinted in* 1990 U.S.C.C.A.N. 712........................................................................................................................21,26

## Glossary

| | |
|---|---|
| Anadarko | Anadarko Petroleum Corporation |
| APC Br. | Opening Brief of Anadarko Petroleum Corporation |
| BOP | blowout preventer |
| BP | BP Exploration & Production Incorporated |
| BP Br. | Opening Brief of Appellant BP Exploration & Production Incorporated |
| CWA | Clean Water Act |
| MODU | mobile offshore drilling unit |
| OCS | Outer Continental Shelf |
| OCSLA | Outer Continental Shelf Lands Act |
| OPA | Oil Pollution Act of 1990 |
| Transocean | Transocean defendants: Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH. |

1

# JURISDICTIONAL STATEMENT

In this civil enforcement action brought by the United States, the district court had jurisdiction under 28 U.S.C. 1331, 1333, 1345, 1355; 33 U.S.C. 1321(b)(7)(A)-(E), 1321(n), 2717; and 43 U.SC. 1349.  10-4536:USCA5 46.[1] Defendants-Appellants Anadarko Petroleum Corporation ("Anadarko") and B.P. Exploration & Production Incorporated ("BP") filed notices of appeal on August 24, 2012, and September 18, 2012, respectively, invoking appellate jurisdiction for an interlocutory appeal under 28 U.S.C. 1292(a)(3) and Fed. R. App. P. 4(a)(1)(B), 4(a)(7)(A)(ii).  They seek appellate review of a February 22, 2012, district court ruling that they are liable for civil penalties under 33 U.S.C. 1321(b).  Transocean, then a defendant-appellee, moved to dismiss the appeals for lack of jurisdiction. The United States took no position on whether this Court has jurisdiction over Anadarko's and BP's appeals.  On February 5, 2013, this Court denied Transocean's motion to dismiss.

---

[1] The United States' case was consolidated with hundreds of other cases in a multi-district litigation proceeding in the Eastern District of Louisiana and the majority of documents are docketed under MDL No. 10-2179.  Those documents are cited herein as "USCA5" followed by the page number. Citations to documents filed under the original district court docket number (No. 10-4356) are cited as above with that docket number added.

## STATEMENT OF THE ISSUE

Are BP and Anadarko liable for civil penalties under Section 311(b)(7) of the Clean Water Act ("CWA"), 33 U.S.C. 1321(b)(7), as owners of the Macondo Well, a deepwater offshore oil well located on the Outer Continental Shelf of the Gulf of Mexico, from which massive quantities of oil continuously discharged in violation of the Act for three months in 2010?

## STATEMENT OF THE CASE

This case arises from the loss of control and blowout of the Macondo Well on April 20, 2010, which resulted in explosions and fires on the drilling rig, *Deepwater Horizon*, the death of eleven men, and the discharge of millions of barrels of oil into the Gulf of Mexico.  For nearly three months in 2010, the Nation was transfixed by images of a seemingly endless onslaught of oil gushing uncontrollably into the Gulf of Mexico.  This catastrophic oil spill was the largest in United States history and has caused enormous damage to the people and environment of the Gulf region.

In December 2010 the United States filed this civil enforcement action seeking (1) a declaratory judgment for costs and damages under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. 2701 *et seq*., and Declaratory Judgment Act, 28 U.S.C. 2201 *et seq.;* and (2) civil penalties under CWA Section 311(b)(7), 33 U.S.C.1321(b)(7), from parties responsible for the discharge of oil.  10-

3

4536:USCA5 62-67.  Defendants included BP and Anadarko, owner-operator and co-owner, respectively, of the Well, and Transocean, the contractor hired to drill the Well and owner of the mobile offshore drilling unit ("MODU") *Deepwater Horizon*, in use for this purpose at the time of the incident.  10-4356:USCA5 52-53,54.

CWA Sections 311(b)(3) prohibits the discharge of harmful quantities of oil in connection with oil exploration activities on the Outer Continental Shelf.  33 U.S.C. 1321(b)(3).  Section 311(b)(7)(A) makes owners of offshore oil wells from which oil discharges in violation of this prohibition strictly liable for civil penalties.  33 U.S.C. 1321(b)(7)(A).  The district court held in an interlocutory ruling on cross-motions for summary judgment that BP and Anadarko are liable for CWA civil penalties as owners of the Macondo Well.  The district court has not yet determined the amount of civil penalties to assess against these liable parties.

BP and Anadarko appeal from the district court's holding that they are liable for civil penalties.  They argue that they are not liable for civil penalties as owners of the Macondo Well because no oil discharged from the Well, notwithstanding there is no dispute that the millions of barrels of oil that fouled the Gulf in 2010 flowed out of the Well as the result of a well blowout.  They interpret the CWA as allowing them to escape penalty liability as owners of the Well solely because on its 2.5 mile path from the bottom of the Well to the waters of the Gulf of Mexico,

4

oil briefly passed through and last touched equipment that was physically and

operationally attached to the Well, but owned by the contractor, Transocean.

Under BP's and Anadarko's reading of the CWA, well owners would effectively

be insulated from liability for CWA civil penalties when they hire a contractor to

perform certain drilling functions—regardless of the culpability of the well owners.

## STATEMENT OF FACTS

### I.  STATUTORY BACKGROUND

The CWA establishes a comprehensive program designed "to restore and

maintain the chemical, physical, and biological integrity of the Nation's waters."

33 U.S.C. 1251(a).  In furtherance of that goal, the CWA broadly prohibits

discharge of pollutants into waters of the United States under several provisions.

One such provision is CWA Section 301(a), 33 U.S.C. 1311(a), which prohibits,

except in compliance with a permit, the "discharge of any pollutant."  The term

"'discharge of any pollutant,'" is defined to mean: "(A) any addition of any

pollutant to navigable waters from any point source, [and] (B) any addition of any

pollutant to the waters of the contiguous zone or the ocean from any point source

other than a vessel or other floating craft."  33 U.S.C. 1362(12).  Under EPA's

long-standing interpretation, the exclusion of "vessels or other floating craft" in

subpart (B) of this definition applies only when vessels are functioning as a means

of transportation; the exclusion does not apply when a vessel is operating in

another capacity, such as when in use for mining or as an oil rig.  *See* 40 C.F.R.

122.3(a); 44 Fed. Reg. 32854, 32859 (June 7, 1979).  "'Point source' means any

discernible, confined and discrete conveyance," including, for example, a pipe,

conduit, well, or vessel "from which pollutants are or may be discharged."  33

U.S.C. 1362(14).

Another provision prohibiting discharges is CWA Section 311.[2]  In relevant

part, Section 311(b)(3) provides that  "[t]he discharge of oil or hazardous

substances (i) into or upon the navigable waters of the United States, adjoining

shorelines . . . , or (ii) in connection with activities under the Outer Continental

Shelf Lands Act ["OCSLA," 43 U.S.C. 1331 *et seq.*] . . . in such quantities as may

be harmful as determined by the President . . . , is prohibited . . . ." 33 U.S.C.

---

[2] The genesis of current CWA Section 311 dates to 1970, when Congress, reacting to the blowout of, and ensuing spill from, an offshore oil well near Santa Barbara, California, enacted the Water Quality Improvement Act of 1970 to prohibit the discharge of oil into or upon navigable waters, adjoining shorelines, and contiguous zone in harmful quantities.  The Act provided that owners or operators of any vessel, onshore facility, or offshore facility from which oil discharged were liable for penalties for knowing violations and strictly liable up to specified limits for clean-up costs.  *See*  Pub. L. No. 91-224, §11, 84 Stat. 91, 91-95 (1970).  In 1972, these provisions were reenacted, as modified, into Section 311 of the CWA; the civil penalty provision was modified to eliminate any mens rea requirement. Pub. L. No. 92-500 §311, 86 Stat. 816, 864-65 (1972).  Subsequent amendments to Section 311 expanded its scope by prohibiting discharges in connection with, *inter alia*, offshore oil exploration activities on the Outer Continental Shelf (*see* 33 U.S.C.1321(b)(3)(ii)); raised the amount of civil penalties; identified factors to be considered in determining the amount of penalties (*see* 33 U.S.C. 1321(b)(7)(D), 1321(b)(8)); and supplanted and shifted provisions addressing liability for costs and damages for oil discharges to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. 2701 *et seq.*

1321(b)(3).[3]  Activities under OCSLA include the drilling of an oil well on the

Outer Continental Shelf ("OCS").  *See* 43 U.S.C. 1331, 1333(a), 1334; *see*

*generally* 30 C.F.R. Pt. 250 (OCSLA regulations).  CWA Section 311(a)(2)

provides that the term "'discharge' includes, but is not limited to, any spilling,

leaking, pumping, pouring, emitting, emptying or dumping" (with exceptions not

applicable here).  33 U.S.C. 1321(a)(2).

CWA Section 311(b)(7)(A) provides for assessment of civil penalties for

violations of Section 311(b)(3), stating:

> Any person who is the owner, operator, or person in charge of any
> vessel, onshore facility, or offshore facility from which oil  . . . is
> discharged in violation of paragraph (3), shall be subject to a civil
> penalty in an amount up to $25,000 per day of violation or an amount
> up to $1,000 per barrel of oil . . . .

33 U.S.C. 1321(b)(7)(A).  The amount of penalties increases to not less than

$100,000, and not more than $3,000 per barrel of oil in any case in which a

discharge in harmful quantity was the result of a liable person's gross negligence

---

[3] An EPA regulation promulgated under Section 311(b)(4), provides that a quantity
of oil that may be harmful includes discharges that "cause a film or sheen upon or
discoloration of the surface of the water or adjoining shorelines or cause a sludge
or emulsion to be deposited beneath the surface of the water or upon adjoining
shorelines."  40 C.F.R. 110.3; *see also Chevron, U.S.A. v. Yost*, 919 F.2d 27, 30
(5th Cir. 1990) (upholding regulation and explaining that statutory phrase "may be
harmful" allows EPA to proscribe incipient harm).

or willful misconduct.  33 U.S.C. 1321(b)(7)(D).[4]  Section 311(b)(8) further

provides that in determining the amount of a civil penalty, the court shall consider:

> the seriousness of the violation or violations, the economic benefit to the
> violator, if any, resulting from the violation, the degree of culpability
> involved, any other penalty for the same incident, any history of prior
> violations, the nature, extent, and degree of success of any efforts of the
> violator to minimize or mitigate the effects of the discharge, the economic
> impact of the penalty on the violator, and any other matters as justice may
> require.

33 U.S.C. 1321(b)(8).

Civil penalties paid under Section 311(b) are generally deposited into the Oil

Spill Liability Trust Fund.  *See* 33 U.S.C. 1321(s).  This trust fund is used to

finance, *inter alia*, the governmental costs incurred in cleaning up oil spills,

administration and enforcement of the Act, and payment of claims for

uncompensated removal costs and damages, including claims by owners or

operators able to establish statutory defenses or applicable liability limits.  *See* 33

U.S.C. 2712.  In 2012, Congress enacted the Resources and Ecosystems

Sustainability, Tourist Opportunities and Revived Economies of the Gulf Coast

States Act of 2012 (RESTORE Act), Pub. L. No. 112-141, §1602, 126 Stat. 588,

which directs that 80% of civil penalties paid in connection with the incident at

issue here be deposited in a newly-created, separate trust fund known as the "Gulf

---

[4] Under the inflation adjustment rule, *see* 40 C.F.R. 19.4, the statutory maximum
penalty amounts applicable here are $1,100 and $4,300 per barrel, respectively for
Sections 311(b)(7)(A) and 311(b)(7)(D).

Coast Restoration Trust Fund."  33 U.S.C. 1321(t).  Gulf Coast States and a Gulf

Coast Ecosystem Restoration Council (comprised of federal agencies and Gulf

States) are entitled to direct funds from this trust fund for expenditure on

ecological and economic restoration activities and projects in the Gulf Coast

region.  33 U.S.C. 1321(t)(1) & (2).

## II.    DEEPWATER DRILLING BACKGROUND

Deepwater offshore oil wells are drilled at great depth—typically at depths

of over 1,000 feet in areas that lie on the continental shelf or beyond.[5]

Hydrocarbons trapped deep within the seafloor are under tremendous pressure

from the weight of the rocks and water above and will rapidly move to the surface

if a pathway is made available.  USCA5 2391-92.  "The principal challenge in

deepwater drilling is to drill a path to the hydrocarbon-filled pay zone in a manner

that simultaneously controls these enormous pressures and avoids fracturing the

geologic formation in which the reservoir is found."  USCA5 2392.  The Macondo

Well, for example, was drilled to a depth of approximately 3.5 miles below sea

level, under 5,000 feet of Gulf water and then 13,000 feet of earth.  USCA5 2395.

Uncontrolled intrusion of hydrocarbons into a wellbore (hole) can lead to an out-

of-control discharge as the oil and gas rushes under the influence of pressure up the

---

[5] *See generally* National Commission on the BP Deepwater Horizon Oil Spill and
Offshore Drilling, Chief Counsel's Report, Ch. 2 for description of deepwater
offshore drilling (*available* at http://www.oilspillcommission.gov/chief-counsels-
report (hereafter "Chief Counsel's Report").

well.  USCA5 2392.  An uncontrolled discharge is known as a "blowout."  USCA5 2392.

Physical and operational barriers are employed to work together to prevent hydrocarbon flow into the wellbore and prevent a blowout.  An example of an operational barrier is the circulation of drilling mud during drilling to counterbalance the pressure exerted by the oil reservoir.  USCA5 2392.  Physical barriers within a well include cement and casings, steel tubes installed to line the well as drilling progresses.  USCA5 2393.  Cement and casings provide structural integrity to the well, isolate the wellbore from previously penetrated formations, and prevent hydrocarbons from entering the wellbore.  As this case illustrates, if hydrocarbons are allowed to enter casings, the casings may be a conduit through which oil moves rapidly and with great force up and out of the well.  USCA5 2393.

Early in the process of drilling a deepwater well, a wellhead (which is a component of the well) is installed on the seabed at the entrance of the wellbore. USCA5 2394.  The wellhead includes fittings that allow a device known as a blow out preventer ("BOP") to be attached. The BOP is a stack of valves that rig crews use both as a drilling tool and as an emergency safety device. USCA5 2393. In the latter function, when activated, the BOP essentially operates as a valve designed to stop a blowout from progressing and to seal the well.  The BOP is attached to the drilling rig, afloat on the ocean, by one or more pipes known as risers.  Chief

10

Counsel's Report, Ch. 2 at 16-17.  Once the BOP is in place atop the wellhead,

everything used in the drilling process, including the drill, drilling mud, tools, and

well components (*e.g.*, casing and cement), passes through the BOP as they enter

or exit the well.  Chief Counsel's Report, Ch. 2 at 17.  While connected, the well,

BOP, riser, and oil rig comprise a physically-connected and mechanically-

integrated system that work together to control the well and avoid a blowout.



**Figure 4.2.1**
Artist's rendering of
the Macondo well
from rig to rathole.

## III.   UNDISPUTED FACTS ESTABLISHING THE WELL OWNERS' CWA PENALTY LIABILITY

BP and Anadarko were co-lessees of Block 252, an area located on the OCS

of the Gulf of Mexico.  USCA5 7798.  BP and Anadarko were also co-owners of

the Macondo Well located within Block 252, owning 65% interest and 25%

interest, respectively.[6]   USCA5 7799.  They shared ownership and proportionate

costs of both physical components and tangible personal property.  *See* USCA5

5976-5980,6511-15,6519,7798–99.  The Macondo Well was located approximately

fifty miles from the coast of Louisiana, on and below the seabed of the OCS.  BP

was the designated operator (under then-existing Department of the Interior

regulations) for any activities on Block 252.  BP designed the Well and specified

how it was to be drilled, and was actively involved in day-to-day operations.

USCA5 2393.

　　　Transocean was hired to provide an oil rig and crew to drill the Macondo

Well.  USCA5 2393.  From February through a portion of April 2010, the

*Deepwater Horizon*, a mobile offshore drilling unit ("MODU") owned by

Transocean, was the rig used to drill the Well.  USCA5 2393,5985,7410.  A

MODU is a self-powered oil rig, capable of performing drilling operations for the

exploration or exploitation of sub-sea oil and of moving from well to well.  A

MODU is always a vessel under maritime law and admiralty jurisdiction.  USCA5

7811.  A MODU is also capable of use as an offshore facility and can have dual

status as both vessel and offshore facility, depending on its use.  *See* USCA5 7803-

05, 7811; 33 U.S.C. 2701(18) (MODU "means a vessel . . . capable of use as an

---

[6] The United States' claims against a third well owner, MOEX Offshore 2007, were resolved by settlement.

offshore facility"); *infra* at 35-39. At the time of the blowout here, the MODU was being used as an offshore facility. USCA5 7811. The BOP and riser were appurtenances to the *Deepwater Horizon* owned by Transocean. USCA5 5985, 7799.

The Macondo Well was an exploratory well developed to assess the presence of extractable hydrocarbons and potentially to produce oil. Hydrocarbon zones were in fact discovered and the decision was made to install production casing so that the Well could eventually be completed and used as a production well. USCA 2393,6520,7799. By April 20, 2010, actual drilling of the wellbore had been completed to a depth of approximately 2.5 miles below the seabed, the final (production) casing had been set, and cement had been placed in the annular space around the casing and to plug the bottom of the hole (*i.e.,* the shoe track) for the purpose of sealing off the hydrocarbon-bearing reservoir and preventing hydrocarbons from entering the wellbore from the reservoir. USCA5 5986. The *Deepwater Horizon* and BP were in the process of implementing a temporary abandonment procedure created by BP to secure the Well so that the *Deepwater Horizon* could detach (including removal of the BOP) and depart. USCA 7799. Another rig could later move to the site and complete the well construction process for oil production.

On April 20, 2010, while the *Deepwater Horizon* was still physically attached to the Well via the riser and BOP, a blowout occurred, resulting in explosions and fire aboard the *Deepwater Horizon*.  USCA5 5987,7799.  The explosions killed eleven men on the *Deepwater Horizon*.  USCA5 6522.  Two days later, the *Deepwater Horizon* sank into the Gulf of Mexico, severing the riser pipe.  The BOP and remnant of broken riser remained attached to the wellhead.  USCA5 7799.  As a result of these events, massive quantities of "[o]il flowed from the Macondo Well, up the wellbore, through the blowout preventer ("BOP") and remaining segment of riser pipe, and into the Gulf of Mexico, and continued to do so until July 15, 2010."  USCA5 7799.  During the three-month discharge the riser segment was cut off in connection with efforts to bring the Well under control.  Oil spread from the Macondo Well site through the waters of the Gulf and to adjoining shorelines.  *See, e.g.*, USCA5 2459-2467.

IV.   **DISTRICT COURT PROCEEDINGS**

A.   **THE DISTRICT COURT'S FEBRUARY 22, 2012, ORDER ON LIABILITY**

The United States moved for partial summary judgment against Anadarko, BP, and Transocean on certain liability issues.  USCA5 6471.  In relevant part, the United States sought a declaratory judgment adjudging that (1) Transocean, Anadarko, and BP are jointly and severally liable for removal costs and damages under Section 1002(a) of OPA, 33 U.S.C. 2702(a); and (2) that BP, Anadarko, and

Transocean are liable as owners and/or operators for civil penalties under CWA Section 311(b)(7)(A), 33 U.S.C. 1321(b)(7)(A). USCA5 6471.

Anadarko cross-moved for partial summary judgment, arguing that it had no liability for CWA civil penalties because oil did not discharge from the Well. USCA5 7800. BP adopted Anadarko's argument in contesting the United States' motion for summary judgment. USCA5 7341–42. Anadarko and BP took the position that *only* Transocean could be held liable for CWA civil penalties as an owner because oil discharged *only* "from" the BOP/riser owned by Transocean. Transocean also cross-moved for summary judgment (USCA5 7800), in which they made the inverse argument, *i.e.*, that oil discharged *only* from the Well and *only* the owners of the Well (Anadarko and BP) are liable for CWA penalties as owners. USCA5 6941. The United States argued that all of these parties are strictly liable as owners for the discharge because the Well and BOP are inherently interconnected (an interconnectedness reflected in the undisputed facts) and because Section 311(b)(7) provides that *any* owner of *any* vessel or offshore facility from which oil is discharged is subject to penalties.

In a February 22, 2012, order, the district court granted in part, and denied in part, the United States' and Transocean's motions, and denied Anadarko's motion for summary judgment. USCA5 7821. With respect to OPA claims, which are not in this appeal before this Court, the district court concluded that BP and Anadarko

are jointly and severally liable for costs and damages under OPA for the subsurface

oil discharge. The district court concluded that Transocean is not liable as an

owner under OPA Section 1002(a), 33 U.S.C. 2702(a), for subsurface oil discharge

because when a MODU is being used as an offshore facility (as it was here), the

responsible parties under OPA for subsurface discharge are the lessees of the area

in which the facility is located (*i.e.*, BP and Anadarko).  USCA5 7804-09.

The district court granted the United States' motion for summary judgment

as to Anadarko's and BP's liability as owners of the Well for CWA civil penalties.

The district court held that for purposes of Section 311(b)(7), oil discharged from

the Macondo Well, an offshore facility.  USCA5 7819.  The court explained that

the "discharge occurred where the uncontrolled movement of oil began," *i.e.*, from

the Macondo Well.  USCA5 7815. The court noted that Anadarko's argument that

oil discharged only from the *Deepwater Horizon* because oil passed through the

BOP and broken riser immediately before entering the Gulf "is essentially based

on fortuity" and would premise liability on the happenstance of what equipment

survived the sinking of the MODU.  USCA5 7816.  The district court concluded

that such a result "would be absurd when in all circumstances the uncontrolled

movement of oil began in the Macondo Well."  USCA5 7816.  The district court

also noted that the well owners' theory contradicted the purpose of CWA civil

penalties, which Congress intended would be borne by those—like BP and

16

Anadarko—"directly engaged in the enterprise which caused the spill" and who stood to profit from the oil produced by the Well.  USCA5 7817.  Because BP and Anadarko were liable as owners, the court found it unnecessary to address whether BP and Anadarko were also operators or persons in charge of the offshore facility.  USCA5 7820.

The district court denied Transocean's motion for partial summary judgment on CWA penalty liability.  USCA5 7821.  The court held that subsurface discharge was not from the *Deepwater Horizon,* but found that Transocean might be liable under Section 311(b)(7) as an operator or person in charge of the offshore facility.  USCA5 7819-21.  The court found that there were disputed issues of facts relevant to the operator or person in charge issues that precluded resolution on summary judgment.  USCA 7820.

The district court has not yet determined the amount of penalties to assess BP and Anadarko.  The district court has divided trial on unresolved issues into phases.  As yet unresolved issues relevant to penalties include, *inter alia*, BP's gross negligence and willful misconduct, amount of oil discharged, and culpability of liable parties.

## B.    CONSENT DECREE RESOLVING CWA CLAIM AGAINST TRANSOCEAN

On February 19, 2013, the district court entered a partial consent decree between the United States and Transocean in which Transocean agreed to pay

CWA civil penalties in the amount of $1 billion.  District Court Doc. Nos. 8608 &

8609.[7]

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*,

applying the same standard as the district court.  *Performance Autoplex II Ltd. v.

Mid-Continent Cas. Co.*, 322 F.3d 847, 853 (5th Cir. 2003). "Summary judgment

should be granted if there is no genuine issue of material fact for trial and the

moving party is entitled to judgment as a matter of law." *Id.* at 853; Fed. R. Civ. P.

56(c).

## SUMMARY OF ARGUMENT

BP and Anadarko are liable for CWA civil penalties as owners of the

Macondo Well for the oil spill from the well blowout.  Section 311(b)(7) provides

that owners of offshore facilities from which harmful quantities of oil discharge in

connection with offshore oil drilling are strictly liable for civil penalties.

---

[7] The United States does not at this time appeal the court's February 22, 2012,
order.  That does not mean that the United States agrees with the district court's
holdings adverse to the United States.  In fact, we affirmatively disagree with
district court's holding that Transocean was not liable as an owner for civil
penalties, but the consent decree resolves the CWA penalty claim against
Transocean.  The United States reserves the right to appeal any live issues
following a final judgment (or some other appealable order). *See Farbwerke
Hoechst A.G. v. M/V "Don Nicky,"* 589 F.2d 795, 797 (5th Cir. 1979); *El Fenix
de Puerto Rico v. M/Y JOHANNY*, 36 F.3d 136, 140 (1st Cir. 1994); *Wright,
Miller, and Cooper*, Federal Practice and Procedure § 3927 (2d ed.) (failure to take
interlocutory appeal under 28 U.S.C. 1292(a)(3) does not forfeit right to review on
appeal from final judgment).

Undisputed facts readily establish all of the requisite elements for BP's and Anadarko's penalty liability as owners of the Well.  There is no dispute that the oil that caused such enormous damage in the Gulf Region flowed out of the Macondo Well as the result of loss of well control (a blowout).  Hydrocarbons moved into the Well, flowed up the 2.5 mile Well, and gushed through the wellhead and attached BOP/riser into the ocean continuously for three months.  BP and Anadarko incorrectly contend that they are not liable for civil penalties because there was no "discharge" of oil "from" the Well in violation of the Act.  Contrary to their contention, the uncontrolled movement, starting from the bottom of the Well and culminating with oil flow into the ocean, was a discharge, that is, a leaking, spilling, emitting, and pouring of oil.  Under the ordinary meaning of "from," the oil discharged in the first instance "from" the Well:  the Well was the starting point of the uncontrolled movement, it was the original source of the oil, and the Well was the means, conduit, and cause for oil movement from the oil reserves deep below the seabed to the ocean.

BP and Anadarko contend that because oil did not enter into the ocean immediately upon exiting the wellhead—but rather, passed through and last touched the BOP/riser attached to the wellhead on its path to the ocean—as a matter of law, oil discharged *only* from the BOP/riser and thus *only* Transocean is subject to civil penalties as the owner of that equipment.  Their position reflects an

19

erroneously cramped view of the Act's prohibition on discharges and civil penalty

liability.

BP and Anadarko argue that they are insulated from penalty liability as well

owners because Section 311(b)(7)(A) only allows a penalty to be assessed against

either the owner of a vessel or against the owner of an offshore facility for a single

discharge, but not both – regardless of the facts or whether both sets of owners

meet the conditions for violation of the Act and penalty liability.  Their

exclusionary interpretation and last touch rule for insulating owners of discharging

offshore facilities from penalty liability for violations are incorrect.

There is no merit to Anadarko's suggestion that the flow of oil into, up, and

out the Well here was controlled, lawful movement.  Anadarko reaches this

improbable result by arguing that a prohibited discharge is limited to an

"immediate" or direct release of oil into water.  However, no such limiting words

appear in the statute and such a limitation would ignore that the relevant

prohibition forbids discharges of harmful quantities of oil in connection with

activities under OCSLA.  Furthermore, courts have rejected the notion that there is

no discharge of pollutants from a property if pollutants travel through property

owned by someone else on its path to water. That should especially be the case

where, as here, the other property is equipment owned by a contractor working for

20

the well owners.  Anadarko attempts to equate the oil movement here to other

lawful movements, but its analogies bear no relation to reality.

Finally, BP and Anadarko's equitable arguments are unpersuasive and, in

any event, under the statutory scheme are appropriately considered when assessing

the amount of penalties, not when determining threshold liability.  The rule of

lenity or a canon disfavoring penalties cannot be invoked here because the statute

is not ambiguous after applying traditional tools of statutory construction.

## ARGUMENT

## I.  BP AND ANADARKO ARE LIABLE FOR CWA CIVIL PENALTIES AS OWNERS OF THE MACONDO WELL

### A.    THE CWA IMPOSES STRICT LIABILITY FOR CIVIL PENALTIES

In enacting Section 311(b), Congress made the "unequivocal declaration,"

*United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127 (5th

Cir. 1981), that

> [I]t is the policy of the United States that there should be no discharges of oil
> . . . into or upon the navigable waters of the United States, adjoining
> shorelines, or into or upon the waters of the contiguous zone, or in
> connection with activities under [OCSLA, 43 U.S.C. § 1331 *et seq.*].

33 U.S.C. § 1321(b)(1).  To that end, Section 311(b)(3) broadly and flatly prohibits

the "discharge of oil . . . (i) into or upon the navigable waters of the United States,

adjoining shorelines, or into or upon the waters of the contiguous zone, or (ii) in

connection with activities under [OCSLA]" in quantities that may be harmful.  33 U.S.C. 1321(b)(3).

Section 311(b)(7)(A) imposes a "strict" (or sometimes referred to as "absolute") liability standard for civil penalties on owners, operators, and persons in charge of facilities and vessels discharging oil or hazardous substances in violation of Section 311(b)(3), meaning that liability attaches without fault. *Coastal States*, 643 F.2d at 1127.  Strict penalty liability serves the purposes of "achieving the result of clean water as well as to deter conduct causing spills." *Id.*, at 1128; *see also* S. Rep. No. 101-94, 101st Cong., 1st Sess., at 11 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 732-33 (civil penalties provide incentive to minimize and eliminate human error).  The civil penalty provision also serves the Act's goal of pollution-free water by funding administration, enforcement, remediation, and cleanup of spills.  *Coastal* States, 643 F.2d at 1128.  Congress's intent in imposing strict liability for civil penalties was to "place[] a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same." *Id.*; *see also United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1313–15 (7th Cir. 1978) (strict liability for penalties reflects Congress's determination that persons engaging in an enterprise are the proximate cause of, and responsible for, discharges that actually occur even if not at fault).

While not prerequisites for liability, levels of culpability are considered in

setting the amount of penalties. *See* 33 U.S.C. 1321(b)(7)(D)(gross negligence or

willful conduct increase amount of potential penalties), 1321(b)(8)(degree of

culpability considered in determining amount of penalty).  Under the statutory

scheme as a whole, violators can argue at the penalty determination phase whether

a penalty is disproportionate to their culpability, but cannot escape liability based

on lack of culpability.

### B. UNDISPUTED FACTS ESTABLISH ALL OF THE ELEMENTS FOR IMPOSING CWA CIVIL PENALTIES ON THE OWNERS OF THE MACONDO WELL

Incorporating the most relevant prohibition from paragraph (3), Section

311(b)(7)(A) imposes civil penalty liability on "[a]ny person who is the owner . . .

of any . . .  offshore facility from which oil . . . is discharged," 33

U.S.C.1321(b)(7)(A), "in connection with activities under [OCSLA] . . . in such

quantities as may be harmful," 33 U.S.C. 1321(b)(3).  Here, undisputed facts

establish all of the requisite elements to hold BP and Anadarko liable as owners of

the Well for civil penalties.  Both Anadarko and BP are corporations and therefore

persons.  *See* 33 U.S.C. 1321(a)(7).  They are co-owners of the Macondo Well and

the Well is an offshore facility.  *See* 33 U.S.C. 1321(a)(11); USCA5 7798; *see also*

33 U.S.C. 2701(9); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,*

*Inc.,* 467 U.S. 837, 860 (1984) ("The ordinary meaning of the term 'facility' is

some collection of integrated elements which has been designed and constructed to achieve some purpose.")

Oil discharged from the Well. The oil that fouled the Gulf of Mexico and the Nation's shorelines in 2010 was not the result of natural, *i.e.*, nonhuman-induced, seepage of oil from hydrocarbon reservoirs deep within the earth. Oil gushed into the ocean because the Well that these owners undertook to drill, penetrated the subsea oil reservoirs and created a piped conduit for a seemingly endless flow of hydrocarbons that moved rapidly under high pressure up and out of the Well.

The Well discharged oil within the statutory definition of discharge. "'[D]ischarge includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping." 33 U.S.C. 1321(a)(2). Congress intended for this definition "to cover by its broad term all possible means of fouling the waters with oil." *See* Conf. Rep. No. 91-940, 91st Cong., 2d Sess., at 33 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2712, 2718. The definition of discharge plainly includes oil that flows from an oil well under the influence of pressure. The "discharge" definition does not require an overt "act" such as pumping or other operational activity to propel oil into the water. *See, e.g.. United States v. Jones,* 267 F. Supp. 2d 1349 (M.D. Ga. 2003) (oil migrated from facility to water

via gravity); *Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41, 45 (5th Cir. 1980) (gravity flow).

The fact that after rushing 2.5 miles up the Well, the oil passed through the 53-foot BOP and (for a time) the riser on its path to the ocean does not alter the conclusion that oil discharged from the Well. The Well itself and BOP/riser were part of an interconnected and integrated system for drilling and construction of the oil well. The flow of oil from the bottom of the Well to the ocean was not interrupted, either factually or legally, by this brief passage of oil through equipment owned by the contractor hired to conduct certain drilling functions. The Well and latched-on equipment effectively created a single, connected conduit for uncontrolled movement of oil with tandem subcomponents — akin to a garden hose with an affixed open nozzle.

Under the ordinary usage of "from," oil discharged "from" the Well. There is no dispute that the oil in the Gulf all came out of (meaning, in ordinary usage, "from") the Macondo Well. At a minimum, the word "from" is used to indicate "a starting point" or the source or original or moving force of something" or as "the source, cause, means, or ultimate agent of an action or condition." Websters Third International Dictionary (1993); *see also* The Random House Dictionary of the English Language (2d ed.) (1987) ("from" is "used to specify a starting point in spatial movement" or "used to indicate source or origin"). Moreover, as the

district court reasoned, in the context of a discharge from this well blowout, the court could look at the question not just of source but also of where control was lost.  The Well was the initial source, moving force, means, and conveyance mechanism for the oil's rapid and uncontrolled movement 2.5 miles to the sea.

Finally, the discharge violated Section 311(b)(3) because it occurred in "connection with activities under" OCSLA and the amount was obviously harmful.  *See* 33 U.S.C. 1321(b)(3)(ii).  USCA5 7813.  The Well was located on the OCS and the lease was issued under OCSLA.  Oil exploration and drilling are activities under OCSLA. USCA5 7813; *see also In re Oil Spill by the Oil Rig "Deepwater Horizon" In the Gulf of Mexico*, 808 F. Supp.2d 943, 950-51 (E.D. La. 2011).  The oil spread to navigable waters and adjoining shorelines, thus also violating Section 311(b)(3)(i).

Holding BP and Anadarko liable for civil penalties furthers Congress's stated policy goal that there be no discharges of oil "in connection with" offshore oil drilling activities under OCSLA.  33 U.S.C. 1321(b)(1).  One made liable for penalties can reasonably be expected to take precautions necessary to prevent discharges.  BP and Anadarko advance a strained interpretation of the Act that they claim would result not only in Anadarko and BP incurring no penalty liability as owners of the Macondo Well, but it also would mean that no one would incur Section 311(b)(7) penalty liability as an operator of the Well.  APC Br. 30-31; BP

Br. 5.  Their attempt to interpret the penalty provision of Section 311(b) in a way that completely disassociates the Well from oil spilling into the ocean from a well blowout defies common sense and is inconsistent with the language pertaining to, and purposes of, the CWA civil penalties provision.

Providing strong incentives for well owners and operators to prevent spills from deepwater offshore oil well blowouts is especially important because spills from such facilities are more likely to be even more catastrophic than spills from vessels transporting oil.  While vessels carry finite supplies of oil, a spill from an OCS oil facility can involve "prodigious and seemingly unlimited quantities" of oil and "spills from these facilities are often difficult to control."  S. Rep. No. 101-94, at 26-27 (Additional Views of Sen. Chaffee).

## II.     BP'S AND ANADARKO'S ARGUMENTS FOR EVADING PENALTY LIABILITY ARE MERITLESS

BP and Anadarko argue that they are not liable as owners for civil penalties because no oil discharged *from* the Macondo Well in violation of Section 311(b)(3). The well owners' position that oil did not discharge from the Well is truly audacious given BP's admission in its answer to the United States' complaint that oil "flowed into the Gulf of Mexico *from* the Macondo Well for 87 days." USCA5 1508–09 (emphasis added); *see also* BP Answer ¶ 6, USCA5 1528 (admitting that "on and for a period of time after April 20, 2010, oil flowed *from* the Macondo well, some of which flowed into and upon waters of the Gulf of

Mexico and some of which reached the shoreline of the United States") (emphasis added).  Moreover, BP admitted in a guilty plea to criminal charges—for which it was fined $4 billion in criminal penalties—that it violated CWA Section 311(b)(3) when it "negligently discharged and caused to be discharged oil *from* the Macondo Well." *United States v. BP Exploration & Production Inc.*, No. 12-cr.292 (Rec. 2-1 at 15-16 (emphasis added).  And, BP has accepted OPA liability which is premised on the oil discharging from an offshore facility. *See* 33 U.S.C. § 2702(a); BP Br. 22–23, 50–51, 67–68.  BP now incongruously argues that it is insulated from civil penalty liability because oil discharged *only* from the appurtenances to the *Deepwater Horizon*, and not at all from the Macondo Well.

BP and Anadarko advance two primary arguments to reach their desired result.  BP principally relies on a so-called "single source" rule that it makes up out of whole cloth.  BP Br. 39-52; *see also* APC Br. 20-24.  Anadarko principally focuses on the word "discharge" and argues that the Well did not discharge oil in violation of Section 311(b)(3).  APC Br. 24-30.  As we demonstrate below, their arguments are legally erroneous and defy common sense.

### A.    THE WELL OWNERS' SINGLE SOURCE INTERPRETATION OF SECTION 311(b)(7)(A) IS INCORRECT

Relying principally on the word "or," BP and Anadarko interpret Section 311(b)(7)(A) as limiting penalty liability to either the persons owning the offshore facility (them) *or* the person owning the MODU (Transocean), and as not allowing

both sets of owners to be liable. The language of Section 311(b)(7) does not support their exclusionary either/or, but never both, interpretation.

### 1. The Word "Or" in Section 311(b)(7)(A) Is Not Properly Interpreted as Exclusionary and Limiting

Section 311(b)(7)(A) identifies the "persons" who are subject to civil penalties. Nothing in Section 311(b)(7)(A) precludes finding more than one person liable for any particular discharge or imposes a single source rule. "Or" in the context of Section 311 means that to be liable a person has to own or to operate or to be in charge of one (or more) of three types of property (*i.e.*, vessel, onshore facility, or offshore facility). And, "from which" means that oil must have discharged in violation of Section 311(b)(3) from at least one of the types of property (vessel or facilities) that the person owns, operates, or was in charge of. If those conditions are met, the person is liable, regardless of whether other persons might also meet conditions for liability. Thus, BP and Anadarko posit a false dilemma by assuming that the CWA only allows *either* the owners of the Well (BP and Anadarko) *or* the owners of the MODU (Transocean) to be subject to civil penalty liability, but not both. Showing Transocean meets criteria for liability does not relieve the well owners of their own liability. *Cf. Friends of Sakonnet v. Dutra*, 738 F. Supp. 623, 631-32 (D.R.I. 1990) (none of defendants' arguments concerning the liability of another party will relieve them of their own liability).

The understanding that all persons who meet requisite elements are subject to civil penalties is fortified by Congress's use in Section 311(b)(7)(A) of the modifier "any"—*i.e.*, "*any* person who is the owner, operator, or person in charge of *any* vessel, onshore facility, or offshore facility." 33 U.S.C. § 1321(b)(7)(A) (emphasis added). "Read naturally, the word 'any' has an expansive meaning, that is, '*one or some indiscriminately of whatever kind*.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting with emphasis Webster's Third New International Dictionary 97 (1976)); *see also New York v. EPA*, 443 F.3d 880, 885–86 (D.C. Cir. 2006).

BP and Anadarko argue that because "vessel" and "offshore facility" are (supposedly) defined as mutually exclusive types of property (*see* 33 U.S.C. 1321(a)(3) and (a)(11)) and because the disjunctive word "or" is used in the Section 311(b)(7)(A) phrase "any vessel, onshore facility or offshore facility from which oil . . . is discharged," as a matter of law for each discharge either a facility or a vessel is the source from which oil discharges, and never can both a vessel and facility be a source. BP Br. 39–40. As explained in Part II.A.2 below, we do not agree with the well owners' premise that a MODU cannot be considered both a vessel and an offshore facility under the CWA, but even if that were so, their exclusionary or single source argument clearly fails.

The single source rule advocated by BP means, in effect, that even though the Well discharged oil in violation of Section 1321(b)(3), the owners and operators of the Well are exempted from penalty liability for that violation. The disjunctive "or" between vessel and offshore facility is not properly read to create such an exemption from penalty liability. The disjunctive "or" in the context of the Section 311(b)(7)(A) phrase "any vessel, onshore facility, or offshore facility" only means that a discharge from one of the listed types of property *need* be present in order to impose penalties. The word "or" does not preclude the condition of oil discharging from a combination of properties or from multiple components within a facility in violation of Section 311(b)(3). Accordingly, the word "or" in this context is not properly interpreted to preclude under any factual scenario the imposition of liability on both the owner of an offshore well and owner of a vessel for a discharge.

Indeed, if "or" had the exclusionary meaning that BP and Anadarko suggest, then the use of "or" in the phrase "any person who is owner, operator, or person in charge" would preclude concurrent liability on a person who is an owner, a separate person who is an operator and a separate person who is a person in charge of one type of property. In *United States v. M/V Big Sam*, 681 F.2d 432, 438 (5th Cir. 1982), this Court rejected just such result when construing a subsection of Section 311 imposing liability for cleanup costs on the "owner or operator" of a

non-discharging third-party vessel that was the sole cause of a discharge.  There

the district court held that because liability was expressed using the disjunctive

"or," a choice had to be made to impose liability on either the owner or on the

operator, and liability could not be imposed on both persons.  This Court reversed,

holding that the statute afforded the government a remedy against either the owner

or the operator or both.  *Id.*  This Court explained:

> Having in mind the intent of the [Clean Water] Act to provide an
> effective remedy through strict liability for recovering cleanup costs
> from oil spills on navigable waters, it would seem that this
> construction is more consistent with the legislative purpose than one
> that would permit an offending vessel or its owners to insulate
> themselves from liability through a bareboat charter to, as here, an
> impecunious and uninsured charterer.

*Id.  Cf. United States v. Earth Sciences, Inc.*, 599 F.2d 368, 375 (10th Cir. 1979)

(rejecting plaintiff's argument that the word "or" in 33 U.S.C. 1319(a)(3) allowed

EPA to pursue only one remedy—a compliance order *or* civil action, not both—

explaining such result would be "plainly inconsistent with the strong enforcement

policy of the [CWA]").

Similarly, the word "or" in Section 311(b)(7)(A), is properly interpreted as

having an inclusionary meaning.[8]  There is no indication that Congress's purpose

---

[8] The well owners cite *Qunidlan v. Prudential Insurance Co. of Am.*, 482 F.2d 876, 878 (5th Cir. 1973), for the proposition that the disjunctive indicates alternatives and requires alternatives to be treated separately.  BP Br. 40; APC Br. 21.  But that is consistent with our point:  each defendant should be evaluated separately to

in limiting Section 311(b)(7) civil penalty liability to discharging vessels or facilities was to limit liability for a single discharge to only one among these categories.  Rather, Congress's purpose in identifying these categories was to exclude from penalty liability persons owning other types of property from which oil might discharge, such as homeowners.  *See* Conf. Rep. No. 91-940 at 34.

Moreover, the word "or" does not plausibly speak to the full extent of BP's single source rule.  The word "or" in Section 311(b)(7)(A) appears between categories of sources and yet under BP's rule there may never be more than a "single" source for a discharge even within categories– *i.e.*, there can be one and only one vessel, or one and only one facility.  BP Br. 52.  And, under BP's rule, the single source must be "the last exit point from a vessel or facility before the discharge entered water" (Br. 47).

BP asserts that the common usage of "from" confirms that *only one source* should bear penalty liability, BP Br. 46–49, but its explanation proves exactly the opposite.  BP explains that the word "from" can be employed in standard usage to refer to more than one place and acknowledges that it has itself described the oil flow here as a discharge from the Well or flow from the Well into the Gulf.  BP Br. 46–49.  BP's explanation of "from" supports the United States' position that both the Well owners and Transocean are liable for penalties because the discharge can

determine whether they meet the requisite criteria.  And if they do, the person is liable regardless of whether someone else also meets the criteria for liability.

accurately be found to be both from the Well and from the BOP.  (At a minimum,

BP's prior statements support finding that oil discharged from the Well.)  BP

asserts, however, that "from" can mean different things in different contexts, and

then *ipse dixit* proclaims that in this context "from" means a "single" source

determined by a last touch rule.  BP's single source rule is made up from whole

cloth and BP cites no authority that supports it.

Contrary to BP's contention (BP Br. 40–41), the holding in *Shell Oil Co. v.*

*United States*, 538 F.2d 346, 1976 WL 23839 (Ct. Cl. 1976), does not support its

rule and, in any event, is only an unpublished, two-paragraph decision by the Court

of Claims that interpreted a subsection of Section 311 that ceased to apply to oil

spills after passage of OPA in 1990.[9]  That subsection  allowed the owner of an

onshore facility from which oil discharged in violation of Section 311(b)(3) to

recover its costs of cleaning-up the discharge from the United States upon

establishing that the discharge was caused by, *inter alia,* the act or omission of a

third party.[10]  The Claims Court unremarkably held that Shell had no viable claim

---

[9]  *See* 33 U.S.C. 1161(i)(1) (1970), recodified to 33 U.S.C. 1321(i)(1) (1973 Supp. III)); Oil Pollution Act of 1990, Pub.L. No. 101-380, § 2002(a), 104 Stats. 484 (1990):  "Subsections (f), (g), (h), and (i) of section 311 of the [CWA] shall not apply to any incident for which liability is established under section 1002 [33 U.S.C. § 2702] of this Act."

[10] Notably, this Court has held that because the third party defense for cost liability provides a limited exception to the strict liability scheme, the defense is not available when an alleged third party is in a contractual relationship with the party

for reimbursement for cleanup costs for a discharge from its onshore facility where Shell alleged that the discharge was from two vessels that Shell did not own and the vessels were floating on water located outside the bounds of Shell's onshore facility. *Id.*; *see also* 33 U.S.C. 1321(a)(10) ("'onshore facility'" is defined as a facility located "in, on, or under any land . . . other than submerged land").

As we argued in district court, this case is an example where the elements for penalty liability have been demonstrated for both the owners of the Well and owners of the MODU. The interconnected relationship of the MODU and Well and their use together for oil exploration on the OCS, the path of the oil discharge through the connected components, and the nature of the violation (discharge in connection with OCSLA activities) make it legally and factually possible for both sets of owners to meet the elements of liability. The district court held that Transocean was not liable as an owner of *Deepwater Horizon* and, while the United States disagrees with that portion of the court's ruling, the consent decree between the United States and Transocean resolved the CWA penalty claim against

seeking to recover costs because it would undermine the statute's scheme if a responsible party could escape liability by hiring contractors. *United States v. LeBeouf Bros. Towing Co.,* 621 F.2d 787, 789 (5th Cir. 1980); *see also Buffalo Marin Service Inc. v. U.S.*, 663 F.3d 750, 757 (5th Cir. 2011) (same under OPA). Here, BP and Anadarko effectively seek to treat the actions of the contractor, Transocean, as a third party defense that relieves them of liability. Their position should be rejected because Section 311(b) does not permit a third party defense for penalties and, in any event, it would undermine the statutory scheme if parties were allowed to evade strict liability through contracting.

Transocean, with Transocean agreeing to pay $1 billion in civil penalties, without

admitting liability.  The only question before this Court is the well owners' liability

and this Court need not decide Transocean's liability.  *Cf. Friends of Sakonnet*, 738

F. Supp. at 631–32 (under EPA's interpretation homeowners and landowners were

both discharging from point source, but it was unnecessary to decide because the

only question before the court was the landowners' liability).

### 2. The Well Owners' Interpretation Is Wrong Because the MODU Was in Use as an Offshore Facility

A further reason that the well owners' exclusionary interpretation of Section

1321(b)(7)(A) should be rejected is that its premise that offshore facility and vessel

are mutually exclusive categories and that a MODU cannot be a hybrid vessel and

offshore facility under the CWA is incorrect.  As the district court correctly held in

its ruling on OPA liability, a MODU can have dual status:  it is a vessel and it is

also an offshore facility when, as here, it is in use as an oil rig.  USCA5 7804; *see*

33 U.S.C. 2701(18) (defining MODU to mean "a vessel (other than a self-elevating

lift vessel) capable of use as an offshore facility").  A MODU also can be

considered both a vessel and an offshore facility under the CWA when it is in use

for offshore oil exploration and drilling.  *See* USCA5 7811 n.20.  The fact that the

MODU, *Deepwater Horizon*, was in use as an offshore facility at the time of the oil

spill makes an exclusionary either/or interpretation untenable.

36

BP and Anadarko agree that under OPA, a MODU is both a vessel and offshore facility and they do not here contest that they are responsible parties under OPA, a conclusion that necessarily assumes that oil discharged from an offshore facility. *See* BP Br. 23; APC Br. 22–23. They contend, however, that under the CWA, a MODU must be treated solely as a vessel. They are incorrect. Under the CWA, a MODU is properly treated as both a vessel and an offshore facility when it is in use for oil drilling and the discharge is related to such use.

In OPA, Congress intentionally restated verbatim the Section 311(a) definitions of "vessel" and "offshore facility" and intended that these terms "have the same meaning [under OPA] as they do under the [CWA] and shall be interpreted accordingly." *See* H.R. Rep. No. 101-653, 101st Cong., 2d Sess. at 101–102 (1990) (Conf. Report), *reprinted in* 1990 U.S.C.C.A.N. 779, 779–80. Under both statutes, an "'offshore facility'" is defined as "any facility of any kind located in, on, or under, any of the navigable waters of the United States . . . other than a vessel or a public vessel." 33 U.S.C. 1321(a)(11); 33 U.S.C. 2701(22). "'[V]essel' means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel." 33 U.S.C. 1321(a)(3); 33 U.S.C. 2701(a)(37). While these definitions may appear to be mutually exclusive, Congress clarified that "'mobile

offshore drilling unit,'" can be both a vessel and an offshore facility when it is in use as an offshore facility.  33 U.S.C. 2701(18).

BP and Anadarko argue that because Congress did not amend CWA Section 311 to add a MODU definition, a MODU may not be treated under the CWA as a hybrid with vessel and offshore facility status, depending on use.  However, the definition of MODU in OPA was not intended as a substantive change in the definitions of "vessel" and "offshore facility," but instead was a clarification as to how those terms apply to this specialized unit.  OPA sheds considerable light on how the term "MODU" should be treated under CWA Section 311 because Congress intended that the terms "vessel" and "offshore facility" have the same meaning in CWA Section 311 and OPA, and because these are closely-related statutes.  Accordingly, under the CWA, a MODU should be treated as having dual status as vessel and offshore facility, depending on its use, consistent with OPA.

The exclusion of vessels from the definition of offshore facility, 33 U.S.C. 1321(a)(11), does not dictate otherwise.  That exclusion is reasonably understood to mean vessels when functioning as a means of transportation.  This interpretation is consistent with EPA's long-standing interpretation of the exclusion of "vessel[s] or other floating craft" from the CWA definition of "discharge of pollutant" as "an addition of any pollutant to the waters of the . . . ocean from any point source other than a vessel or other floating craft."  *See* 33 U.S.C. 1362(12)(B).  EPA interprets

this exclusion to apply only when vessels are in transportation mode and not when they are being used in a capacity similar to land-based facilities, including when used for oil drilling or mining. *See supra* at 4-5; 44 Fed. Reg. at 32859.  While the Deepwater Horizon was "capable of being used as a means of transportation on water" and therefore a vessel, the primary function of the Deepwater Horizon, indeed its *raison d'etre*, was its drilling function. Its drilling-related equipment (including BOP/riser), were appurtenances of the vessel whose only functions were to effect its drilling mission, and therefore have everything to do with the offshore well.

Treating a MODU as an offshore facility when in use as an oil rig is also consistent with Congress's intent expressed in the Conference Report for the Water Quality Improvement Act of 1970 that the Section 311(a)(11) definition of offshore facility include offshore oil rigs.  *See* Conf. Rep. No. 91-940 at 37. MODUs were also included within the definition of "facility" for certain purposes under OCSLA regulations governing oil exploration on the OCS.  *See* 30 C.F.R. 250.105 (2009).

For all these reasons, BP's and Anadarko's exclusionary interpretation of Section 311(b)(7)(A) is wrong.  BP's single source rule is inconsistent with the purposes of civil penalties (*see supra* at 25-26; *infra* at 49-52) and its adoption would undermine the CWA's purpose of protecting water resources.  Accordingly,

it should be rejected. BP and Anadarko are properly found liable for civil penalties as owners of an offshore facility from which oil discharged in violation of the Act, regardless of Transocean's liability.

### B. ANADARKO'S CONTENTION THAT THE FLOW FROM THE WELL WAS LAWFUL AND NOT A DISCHARGE THAT VIOLATED SECTION 311(b)(3) IS MERITLESS

Anadarko principally focuses on the word "discharge" and argues that the flow of oil from the Well was not a discharge prohibited by CWA Section 311(b)(3), but instead was lawful movement of oil. APC Br. 24. It reaches this improbable conclusion by arguing that Section 311(b)(3) only prohibits "immediate" discharges of oil that "directly" enter "into or upon" waters above the OCS (APC Br. 29) and reasoning that oil did not enter the Gulf of Mexico "*directly from the wellhead*"—rather, the oil entered directly and immediately from the BOP/riser attached to the wellhead. APC Br. 36 (emphasis in original). Anadarko argues that the flow of oil from the Well was lawful movement from one container to another, or a "transfer" of oil from the Well to appurtenances of the *Deepwater Horizon*. APC Br. 24–30, 40–43; *see also* BP Br. 6, 45. Anadarko's direct discharge limitation is wrong and its comparison to lawful movements is unpersuasive.

## 1.  The CWA Does Not Forbid Only So-Called "Direct" Discharges

Contrary to Anadarko's contention, Section 1321(b)(3) does not forbid only "immediate" or "direct" discharges.  Br. 15, 20, 24, 27–28.  These words do not appear in any relevant provision of the CWA.  Nor, contrary to Anadarko's suggestion, do the words "into or upon" navigable waters in Section 311(b)(3)(i) limit the Section's prohibitions to "direct" discharges.  APC Br. 29.  As the Supreme Court explained with reference to the CWA Section 301(a) prohibition on "discharge of pollutants":

> The Act does not forbid the "addition of any pollutant *directly* to navigable waters from any point source," but rather the "addition of any pollutant to navigable waters [from any point source]" § 1362(12)(A) (emphasis added); § 1311(a).  Thus, from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a), even if the pollutants discharged from a point source do not emit "directly into" covered waters, but pass "through conveyances" in between.

*Rapanos v. United States*, 547 U.S. 715, 743 (2006) (plurality opinion).[11]  Section 311 is even broader than the Section 301(a) prohibition on "discharge of

---

[11]  The Supreme Court cited *United States v. Velsicol Chemical Corp.*, 438 F.Supp. 945, 946–947 (W.D. Tenn. 1976) (sewer system separated "point source" and navigable waters) and *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1137, 1141 (10th Cir. 2005) (2.5 miles of tunnel separated "point source" and "navigable waters"); *see also Dague v. City of Burlington*, 732 F. Supp.2d 458, 470 (D. Vt. 1989) (flow through culvert City did not own), *aff'd*, 935 F.2d 1343 (2d Cir. 1991), *rev'd on other* grounds, 505 U.S. 557 (1992); *United States v. Ortiz*, 427 F.3d 1278, 1280–81, 1283 (10th Cir. 2005) (dumping chemical waste into a toilet that traveled to a river via sewer system owned and operated by

pollutants," 33 U.S.C. 311(a), because Section 311 does not require that a

discharge be from a point source.  More importantly, the observation of the

plurality in *Rapanos* that the words "from" a point source and "to" navigable

waters in "discharge of pollutants" mean something different than "directly from"

is equally instructive to Section 311(b).

Moreover, courts have repeatedly held persons liable under the CWA for

discharges that traveled to water via property owned by others.  For example, in

*United States v. Jones,* 267 F. Supp. 2d 1349 (M.D. Ga. 2003), the court held an

onshore facility liable for a discharge in violation of Section 311(b)(3)(i), where oil

from the facility migrated down a road and into a city storm sewer system that in

turn led to a tributary of a navigable water.  *Id*. at 1357, 1360–61.  *See also* cases

cited *supra n.* 11.  The law is clear that "dischargers are not insulated from liability

merely because they make illegal discharges via a system owned and operated by

other entities."  *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp.2d

719, 771 (N.D. Cal. 2011).  That should be all the more so where, as here, the other

entity is a contractor hired by BP.  *See United States v. Lambert*, 915 F. Supp. 797,

---

another entity*).  Cf.  United States v. Esso Standard Oil Co*., 375 F.2d 621, 623 (3d
Cir. 1967) (oil facility violated the Rivers and Harbors Act though it did not
directly discharge petroleum into navigable waters, when oil migrated via gravity
from the facility over a road, across a neighbor's property and then into the sea);
*Sierra Club*, 620 F.2d at 45 (miners not relieved from liability simply because they
did not construct conveyances so long as they are reasonably likely to be the means
by which pollutants are ultimately deposited into navigable waters).

802 (S.D. W.Va. 1996) (landowner is strictly liable for discharge where independent contractor performed the work); *cf. LeBeouf Bros. Towing Co.*, 621 F.2d at 789 (Section 311 third-party defense to liability for costs not available when alleged third party is in contractual relationship).

Under the logic of Anadarko's interpretation of discharge, a person could lawfully discharge oil or other hazardous substances (to which Section 311 also applies) by placing a nozzle owned by someone else at the end of a hose. And a facility could avoid penalty liability by contracting with an impecunious vessel to latch on equipment that last touches oil or hazardous substances before entering water. It would undermine the CWA and Congress's strong concern for protection of the nation's water resources to allow evasion of the Act's purposes and prohibition on discharges by such simple expedients.

Anadarko states that the district court's "foremost mistake" was its conclusion that "because the '*uncontrolled movement of oil*' began in the Well, the discharge should be regarded as 'from' the Macondo Well." APC Br. 16-17 (emphasis in original). Anadarko argues that a point source need not be the original source of the pollutant, but need only convey the pollutant, and therefore a discharge from the BOP is a prohibited discharge from a point source. APC Br. 43-44, citing *United States v. Lucas*, 516 F.3d 316, 332-33 (5th Cir. 2008), which in turn cited *South Fla. Water Management Dist. v. Miccosukee Tribe*, 541 U.S.

95, 105 (2004).  But those cases do not help Anadarko and BP avoid their own liability because they do not hold that a discharge from a point source that *is* the source of the pollutant and starting point of uncontrolled movement of pollutants is lawful.  Nor do they negate the cases finding violations when pollutants pass through conduits owned by others on the path to water. [12]

Limiting violations to direct discharges into water is untenable for the further reason that the relevant Section 311(b)(3) language prohibits discharges of harmful quantities "*in connection with activities* under [OCSLA]."  33 U.S.C. 1321(b)(3) (ii) (emphasis added).  Congress added this provision in 1977 amendments to the CWA for the purpose, *inter alia*, of expanding the Section's prohibitions and liability scheme to discharges of oil that occur in connection with oil exploration activities on the OCS, beyond the territorial seas and contiguous zone.  *See* H.R. Conf. Rep. No. 95-830, 95th Cong., 1st Sess., at 91 (1977),

_____

[12] Anadarko relies on these cases to argue that Transocean is liable for penalties because the BOP is a point source that conveyed pollutants. But, as explained above, they are wrong in assuming that if they can demonstrate Transocean also meets criteria for liability, they become insulated from assuming their own liability. While the United States believes that the discharge was also from the BOP, that is not an issue this Court need decide.  The well owners also take issue with the district court's reliance on *Peconic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180, 188 (2d Cir. 2010).  BP Br. 62–65; APC Br. 38–40.  In *Peconic* the Second Circuit held aerial pesticide spraying is a point source discharge under the CWA, reasoning that pesticides discharged from the spray equipment and not, as defendants contended, from the air.  *Peconic*, 600 F.3d at 188.  While *Peconic* is of limited relevance because the disputed issue was materially different than the one here, the decision does support reliance on the ordinary meaning of the word "from."  *Id*. at 188–89.

*reprinted in* 1977 U.S.C.C.A.N. 4424, 4426. This provision readily encompasses so-called indirect discharges into water. BP's and Anadarko's myopic focus on the exact point where oil enters water is inconsistent with the plain language of Section 311(b)(3)(ii). Congress could hardly have envisioned or intended that the extreme flow from the Macondo Well would not be considered a discharge that violates Section 311(b)(3)(ii).

The well owners seem to reason that because there would be no violation in connection with OCSLA activities unless oil enters the ocean, a violation cannot be committed by a discharging facility that is buffered (even if but for a few feet) from the exact point where oil and water meet. But the one does not logically follow from the other. And there is nothing in the language of the statute that creates such exclusion.

BP and Anadarko suggest that under the district court's or government's interpretation of "from," there would be no end to liability through multiple links in a chain of oil production and transportation activity and that a facility owner in Louisiana could be penalized for a discharge from a pipe three states away. BP Br. 51-52; APC Br. 35. Their dire predictions are unfounded. To begin with, discharges far inland would not be discharges "in connection with" OCSLA activities. Second, this case is about the loss of control of one deepwater offshore oil well. The supposed second link involves nothing more than equipment owned

by a contractor hired to drill the Well and this equipment was physically and

operationally interconnected with the Well for that purpose.  There is no chain of

transportation and production links, nor any geographical separation here.

### 2. The Discharge Cannot Reasonably Be Characterized as Movement from One Container to Another or as a Transfer of Cargo

Employing a somewhat different tack to reach its desired result, Anadarko

tries to parse the continuous discharge here into two separate and distinct segments

of movement—*i.e.*, well to equipment (BOP/riser) and then equipment to water.

Anadarko argues that the movement of oil from well to equipment was completely

lawful movement from one container to another, followed by discharge from the

second container.  By way of illustration, Anadarko states that  "in ordinary usage,

a patron who fills her mug with coffee from a pot, then takes a drink, does not

'pour' coffee from the pot into her mouth; rather, she 'pours' the coffee from the

pot into the mug, then 'pours' it from the mug into her mouth."  APC Br. 27.  In a

similar vein, Anadarko trivializes what occurred here by contending that the

movement of oil from the Well to the BOP riser was merely an oil "transfer," no

different than a transfer of oil from a facility into an oil tanker for the purpose of

carrying and transporting the cargo to another facility.  APC Br. 25-26; *see also* BP

Br. 45.  These analogies bear no relation to reality.  Prior to the blowout, the main

body of the *Deepwater Horizon* was physically connected to the Well via the riser

and BOP, and the Well and MODU were parts of a physically-connected and mechanically-integrated structure and operational system that was designed to work together to drill and construct the Well and to maintain well control.

Anadarko's 'pot and mug' concept is wholly misplaced.  In Anadarko's pot and mug example, the items are in fact separate, self-contained receptacles designed to store a finite quantity of liquid and the movements from pot to mug and then mug to mouth are readily understood to be two distinct controlled movements.  By contrast, here the Well and BOP/riser were not separate containers—they were physically and operationally interconnected.  And, during the three-month discharge oil flowed uncontrollably, continuously, and without interruption through the integrated conduit of Well and BOP/riser.

Moreover, a BOP is not intended or designed to be a separate receptacle storing liquid—certainly not in the massive quantities of oil that the Well supposedly "transferred" to it.  Rather, an operative BOP is designed to be an emergency safety device that when activated, functions essentially like a shut-off valve.  The Well, too, was not like a container holding a finite amount of liquid and pouring it under control.  The Well allowed an influx of hydrocarbons and then was a 2.5-mile conduit for a seemingly infinite quantity of oil geysering out the wellhead.  Using a coffee service example, what occurred here is analogous to the spill that would occur if a coffee maker were attached to a water main and multiple

malfunctions occurred, allowing a virtually infinite water supply to flow continuously and under high pressure into, through, and out the coffee maker via the spigot.

Characterizing the flow from the Well as a lawful cargo transfer to the *Deepwater Horizon* is also absurd. The MODU was in use as a drilling rig and was not hired for the purpose of taking on and carrying as cargo the millions of barrels of oil that gushed for months from the Macondo Well.[13] In an actual cargo-loading situation, there would be a finite quantity of oil involved and the offloading facility would have control mechanisms independent of the receiving vessel or facility, allowing the offloading facility to control and stop the "transfer" from its facility as needed. Here, the supposed off-loading facility (Well) was incapable of stopping the so-called transfer and the drilling rig was incapable of taking on as cargo the massive quantity of oil that the Well was uncontrollably "transferring" to it. It is improbable that in an actual oil cargo transfer any court or reasonable person would conclude that an offloading facility acts lawfully and without incurring any penalty liability were it to continue to pump millions of barrels of oil for months after full awareness of the fact that oil was passing directly through a receiving vessel or facility into navigable waters.

---

[13] Anadarko suggests that the purpose of the *Deepwater Horizon's* riser was to receive and transmit fluids back and forth from the Well to the main body of the MODU. APC Br. 42. However, this case is not about discharge of drilling fluids; it is about uncontrolled discharge of millions of barrels of oil.

Furthermore, Anadarko incorrectly suggests (Br. 40–43) that cases involving spills that occurred during cargo loading support the proposition that the *receiving* vessel is *solely* liable for such spills.  In fact, none of the cited cases had occasion to address whether another party was also liable for a spill and none of the parties in these cases disputed that the oil discharged from the subject vessel.  In *United States v. Chotin Transportation, Inc.*, 649 F. Supp. 356, 358 (S.D. Ohio 1986), a tank barge owner was assessed an administrative penalty for a small discharge of gasoline into a river that occurred when a tank on the vessel briefly overflowed during a loading operation.  The barge owner disputed the civil penalty on the grounds that the quantity of oil that fell into the river was too small to be harmful and that the amount of penalty was excessive, *id.* at 360–63.  In *Liberian Poplar Transports Inc. v. United States*, 26 Cl. Ct. 223 (Cl. Ct. 1992), the owner of an offloading vessel sought to be reimbursed (under an act of God exception to strict liability) for costs it incurred in cleaning up oil that it conceded had "leaked from" the vessel.  *Id.* at 224.  The third case, *United States v. The Catherine*, 116 F. Supp. 668 (D. Md. 1953), *aff'd*, 212 F.2d 89 (4th Cir. 1954), involved the United States' unsuccessful claim for civil penalties under a statutory provision (since revoked) imposing a penalty for vessels discharging oil with an exception for "unavoidable accident." *Id.* at 90.  The spill in that case was adjudged an unavoidable accident. *Id.* at 93.

In sum, Anadarko's attempt to demonstrate that the Well did not discharge oil in violation of Section 311(b)(3) fails. The flow of oil from the Well to the ocean was a discharge that violated Section 311(b)(3) and the oil's brief passage through the BOP/riser does not dictate otherwise.

## C.    ANADARKO'S AND BP'S POLICY AND EQUITABLE ARGUMENTS ARE UNAVAILING AND UNPERSUASIVE

BP argues that public policy weighs against CWA liability for well owners. BP Br. 67.  BP maintains that it should not be liable for civil penalties on the grounds that its conduct in this matter violated other statutes and CWA provisions resulting in "ample alternative avenues for pursing BP." BP Br. 67–70.  Its argument misperceives the structure and purpose of the statutory scheme.  These "ample alternative avenues" exist only because BP's conduct was in this matter so egregious as to result in criminal liability and BP's waiver of its OPA liability limits.  *See* 33 U.S.C. 2704(c) (OPA liability limit does not apply when incident proximately caused by gross negligence, willful misconduct, or violation of applicable regulations).  The magnitude of BP's culpability should not absolve it from its civil liability nor should it result in a rule that will shield other well owners involved in future oil spills.

BP asks this Court to take into account "equitable considerations" unique to it when interpreting the liability language of Section 311. BP Br. 67. Such an approach is inappropriate because Section 311 is a strict liability scheme where

liability is determined without reference to fault or conduct of the individual

discharger.  Instead, Congress determined that such factors were properly

considered at the next step of determining the amount of penalties to assess.  33

U.S.C. 1321(b)(8).  Plainly, Congress was aware that dischargers could be liable

for multiple penalties, but chose to place consideration of that factor into the

penalty phase.  *Id.*

Furthermore, the interpretation that BP advances here would apply to other

well owners involved in any future well blowouts and therefore considerations

unique to BP should not be given weight. While BP has paid a criminal fine and

has agreed that the OPA liability limit does not apply to it, in the future other well

owners may not have engaged in criminal conduct and may be subject to OPA

liability limits. Anadarko serves as a useful example. A ruling in this case would

apply equally to Anadarko and BP, yet Anadarko has not been charged criminally

and continues to argue that OPA liability limits apply.  As a result, it is simply

untrue that a ruling in BP's favor would "ensure that parties not encompassed by

Section 1321(b)(7)(A) nonetheless remain financially accountable for the roles

they may play in oil spills." BP Br. 67.

Notably, OPA addresses only liability for "removal costs and damages" and

does not include any civil penalties.  33 U.S.C. 2702(a).  By going beyond simple

restitution, civil penalties have an important deterrent effect. *Friends of the Earth,*

51

*Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 185 (2000).  In

amending Section 311 to increase the amount of penalties, Congress explained that

"[c]ivil penalties should serve primarily as an additional incentive to minimize and

eliminate human error and thereby reduce the number and seriousness of oil

spills." H.R. Rep. No. 101-653, at 154.  Thus, limiting recovery to OPA would

remove a critical element of the incentives crafted by Congress and greatly

diminish the law's ability to prevent future devastating oil spills.  And, BP argues

that under its single source, last touch rule, the well operators (in addition to well

owners) would also be insulated from penalty liability.  BP Br. 5.  A rule that

excludes well operators from penalty liability is plainly inconsistent with the

purpose of the civil penalty provision and with Congress's strong interest in

protecting water resources.

Anadarko's argument that it would frustrate the congressional purpose and

policy to hold mere investors without operational control liable for civil penalties,

is similarly flawed.  APC 17–18.  Section 1321(b)(7)(A) subjects both owners and

operators to penalties.  *See supra* at 30-31.  And, under the statutory scheme,

Anadarko's degree of culpability is properly taken into account when determining

the amount of penalties, not when determining liability under the CWA's strict

liability standard.[14]

BP and Anadarko stood to reap large profits if successful in producing oil

from the well. Transocean was a hired contractor that would not profit from oil

production.  BP's and Anadarko's attempt to insulate themselves from penalty

liability by contending that their contractor alone should be subject to penalties is

not equitable, is not good public policy, and is not what Congress intended.

### D.  THE STATUTE IS NOT AMBIGUOUS AND THEREFORE CANONS ON WHICH ANADARKO AND BP RELY ARE INAPPLICABLE

Invoking the rule of lenity[15] and a corollary anti-civil penalty canon of

construction,[16] Anadarko and BP argue that to the extent that there is ambiguity as

to what Section 311(b)(3) prohibits, the CWA should be construed against holding

---

[14] Anadarko incorrectly asserts that it is undisputed that the Well performed exactly as it was designed to do.  APC Br. 16.  In fact, there is overwhelming evidence that that the Well's annulus cement did not isolate the hydrocarbons and shoe track barrier failed to prevent hydrocarbon entry into the production casing. *See, e.g.*, USCA5 5986-87; Accident Investigation Report commissioned by BP at pp. 10,37 (available at:
www.bp.com/.../bp.../Deepwater_Horizon_Accident_Investigation_Report.pdf-).

[15] Anadarko's invokes the rule of lenity based on a faulty premise that the CWA "penalty provision" can be enforced criminally.  APC Br. 33.  However, Section 311(b)(7)(A), the civil penalty provision at issue here, is not enforced criminally. Rather, the CWA criminal provision, 33 U.S.C. 1319(c), enforces Section 311(b)(3).

[16] Anadarko and BP both cite *World Insurance Co. of Omaha, Neb. v.* Pipes, 255 F.2d 464, 472 (5th Cir. 1958), but that case applies Louisiana insurance law. APC Br. 32; BP Br. 41. None of the cases cited by BP or Anadarko involved the CWA.

them liable.  APC B. 31–33; BP Br. 41–44.  The traditional tools of statutory

construction—text, structure, history, and purpose—must first be applied before

resorting to such canons.  *Barber v. Thomas*, 130 S. Ct. 2499, 2508-2509 (2010)

(rule of lenity).  Assuming these principles otherwise applied (but see nn. 15-16

*supra*), they do not apply here because the statute is not ambiguous after applying

the traditional tools of statutory construction.  The Supreme Court and this Court

have admonished that the rule of lenity should not be invoked simply because a

statute is not "crystalline'" or is difficult to apply.  *DePierre v. United States*, 131

S. Ct. 2225, 2237 (2011).  To invoke the rule of lenity, a court must conclude

"after considering text, structure, history, and purpose, there remains a grievous

ambiguity or uncertainty in the statute . . . such that the Court must simply guess as

to what Congress intended."  *Barber v. Thomas*, 130 S. Ct. 2499, 2508–09 (2010)

(internal quotation marks and citations omitted); *see also United States v. Pruett*,

681 F.3d 232, 240 n.4 (5th Cir. 2012).  That is not this case:  no court would need

to "guess" whether the CWA prohibits oil spills into the ocean from a well owned

by major oil companies.   Given BP's position in the oil industry and pervasive

involvement in the Macondo Well as an owner, operator, and person in charge,

BP's complaint (BP Br. 43) that it had insufficient notice as to what conduct

Section 311(b)(3) prohibits is wholly unpersuasive.

54

### E.    THERE IS NO NEED TO REMAND FOR FURTHER FACT-FINDING

Anadarko and BP argue that the source of "uncontrolled movement" is a disputed factual question that precludes deciding the liability issue on summary judgment.  APC Br. 52-54; BP Br. 53-54.  To the contrary, control connotes the ability to stop and regulate the oil flow from the Well, and Anadarko and BP point to no evidence that would suggest they in fact exercised such control over the flow of oil from the Well.  In fact, it is obvious that the uncontrolled movement of oil began where hydrocarbons entered the Well and under force of pressure moved rapidly up and out the Well.  The movement of oil continued to be uncontrolled as it traveled through the BOP and riser, but that does not negate that the uncontrolled movement that culminated in the water began at the point where hydrocarbons entered the Well.  To the extent that the well owners suggest that they were dependent on Transocean's BOP to bring the blowout under control, BP and Anadarko effectively concede that they could not, and did not have a mechanism to, control the oil flow from the Well once the BOP failed.  The fact that the Well could not of itself stop the flow of oil from the wellhead necessarily means that the flow from the Well was uncontrolled.  Anadarko's suggestion that the proper function of the Well  at the stage of development when this incident happened was to channel and convey oil in massive quantities and under great pressure from the subsea oil reservoir to the oil rig, *Deepwater Horizon,* is inaccurate.  APC Br. 54.

It is undisputed that the Well had not been completed for production and the *Deepwater Horizon* was preparing to detach the BOP and depart so that a different type of rig could later complete the Well for production.

In sum, the Well owners are appropriately held responsible under the CWA and liable for civil penalties when there is a loss of control and discharge from their Well.  Under the strict liability standard for penalties, the Well owners cannot evade penalty liability by arguing that the contractor hired by BP to perform certain drilling functions is also liable.

## CONCLUSION

For the foregoing reasons, the district court judgment adjudging Anadarko and BP liable for CWA civil penalties should be affirmed.

Respectfully submitted,

ROBERT G. DREHER
Acting Assistant Attorney General

STEVEN O'ROURKE
MAGGIE B. SMITH
ELLEN J. DURKEE
/s/ Ellen J. Durkee
Attorneys, U.S. Dep't of Justice
Env't & Natural Resources Div.
P.O. Box 7415 (Ben Franklin)
Washington, DC 20044
(202) 514-4426
ellen.durkee@usdoj.gov

90-5-1-1-10026
July 26, 2013

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Answering Brief of the United States, Plaintiff-Appellee was filed electronically via the Court's CM/ECF Document Filing System on July 26, 2013, and will, therefore, be served electronically upon all counsel who have indicated a preference to be served by email through the CM/ECF system.  I further certify that I caused the foregoing to be served by U.S. mail this 26th day of July, 2013, to the following:

Daniel O. Goforth
Goforth Geren Easterling, L.L. P.
4900 Woodway Dr., Suite 750
Houston, TX 77056-0000

Ky E. Kirby
Bingham McCutchen, L.L.P.
2020 K Street, N.W.
Washington, D.C.  20006-0000

Deborah D. Kuchler
Kuchler, Polk, Schell, Weiner & Richeson, L.L.C.
1615 Poydras Street, Suite 1300
New Orleans, LA 70112

/s/ Ellen J. Durkee
ELLEN J. DURKEE
Appellate Section, Environment & Natural
Resources Division
U.S. Department of Justice
P.O. Box 7415, Ben Franklin Station
Washington, D.C.  20044
(202) 514-4426
ellen.durkee@usdoj.gov

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
TYPE VOLUME LIMITATION**

This brief complies with the type volume limitation set forth in Rule

32(a)(7)(B) of the Federal Rules of Appellate Procedure because, excepting the

portions described in Circuit Rule 32(a)(1), the brief contains 13,811 words.  This

brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because

the brief has been prepared in a proportionally spaced typeface in Times New

Roman with 14-point type.

/s/ Ellen J. Durkee
ELLEN J. DURKEE
Appellate Section, Environment & Natural
Resources Division
U.S. Department of Justice
P.O. Box 7415, Ben Franklin Station
Washington, D.C.  20044
(202) 514-4426
ellen.durkee@usdoj.gov

**CERTIFICATE OF COMPLIANCE WITH ECF RULE A(6)**

I certify that (1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document, Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Microsoft Forefront Client Security version 1.141.1482.0 and is free of viruses.

/s/ Ellen J. Durkee
ELLEN J. DURKEE
Appellate Section, Environment & Natural
Resources Division
U.S. Department of Justice
P.O. Box 7415, Ben Franklin Station
Washington, D.C.  20044
(202) 514-4426
ellen.durkee@usdoj.gov